[No. G007745. Fourth Dist., Div. Three. May 24, 1994.]

GOLDEN WEST BASEBALL COMPANY, Plaintiff and Appellant, v. CITY OF ANAHEIM et al., Defendants and Appellants.

**COUNSEL**

Paul, Hastings, Janofsky & Walker, William B. Campbell, Donald L. Morrow, Bruce D. Ryan, Sean A. O'Brien and Linda Schilling for Plaintiff and Appellant.

Rutan & Tucker, Michael D. Rubin, Thomas S. Salinger, William W. Wynder, Augustini & Wheeler, Alfred E. Augustini, Hufstedler, Kaus & Ettinger and Shirley M. Hufstedler for Defendants and Appellants.

**OPINION**

**WALLIN, J.**—Golden West Baseball Company (GWBC), which owns the California Angels baseball team, sued the City of Anaheim (Anaheim) when Anaheim issued a conditional use permit for Anaheim Stadium Associates (ASA) to construct an office complex on part of the parking lot of Anaheim Stadium. GWBC claimed the proposed development violated the terms of its

"lease"[1] with Anaheim to use the stadium for Angels' home games. The judgment declared GWBC has a leasehold interest in the stadium and parking lot on game days and the proposed office complex breached the lease. It granted specific performance and injunctive relief aimed at preventing the development, but also found Anaheim had the right to develop those portions of the parking area not necessary to provide GWBC with the requisite number of surface-level parking spaces under the lease terms. Judgment was entered in favor of ASA on GWBC's cause of action for intentional interference with a contractual relationship. GWBC, Anaheim, and ASA all appeal the judgment.

On appeal GWBC contends the trial court erred by: (1) ruling Anaheim could develop part of the parking lot area; and (2) denying GWBC a jury trial on its cause of action against ASA for intentional interference with contractual relations. Anaheim contends the trial court erred by: (1) finding the agreement between GWBC and Anaheim is a lease that precludes Anaheim from providing minimum parking under the agreement in any fashion it saw fit, including parking structures; (2) granting GWBC injunctive relief; (3) finding Anaheim breached an amendment to the lease by issuing a conditional use permit for the ASA development; and (4) rejecting Anaheim's defenses of estoppel and unclean hands. ASA echoes Anaheim's arguments, and also contends: (1) GWBC did not prove the elements for specific performance; and (2) the trial court erred by quieting title in favor of GWBC. We affirm as modified.

In 1964 GWBC was anxious to relocate the Angels from Dodger Stadium, where they had been playing their home games. GWBC wanted its own stadium with parking facilities and was willing to enter into a long-term lease with a public entity which would build it. It expressed dissatisfaction with Dodger Stadium's terraced parking, voicing a preference for "flat land" parking. A GWBC representative told Anaheim's mayor the Angels "needed something in the vicinity of 150 acres" for the stadium and parking facilities. Anaheim responded it could provide a suitable site.

After protracted negotiations, GWBC and Anaheim entered into what purported to be a lease agreement (the 1964 agreement) for a stadium with a seating capacity of approximately 45,000 and "facilities," including parking for "a minimum of 12,000 cars for stadium customers." The stadium and facilities were constructed according to later developed plans and specifications. The agreement also provided that the area surrounding the stadium,

---

[1]The parties perceive their respective first contentions turn on whether GWBC had a leasehold interest in the stadium and frame the issue that way. We analyze the issues in that fashion, but will determine the result is the same whether or not GWBC has a leasehold.

except "to the extent necessary to provide the minimum parking for stadium use together with adequate egress and ingress" would be under Anaheim's "exclusive control" and not "bound to use" for GWBC. The parties lived in harmony under this agreement for over a decade until 1977, when Anaheim began negotiations with the Los Angeles Rams of the National Football League to move the Rams home field to Anaheim Stadium.

As part of those negotiations, Rams owner Carroll Rosenbloom and developers Cabot, Cabot & Forbes formed ASA. In 1978 Anaheim entered into a lease with ASA for extensive commercial development on the stadium parking lot as an inducement for the Rams move. Over a four-year period the plans were developed and modified. Meanwhile, GWBC and Anaheim negotiated and entered into an "Amended and Restated Lease Agreement" (the 1981 agreement), which acknowledged the parties disagreed about GWBC's right to control development on the parking lot. The agreement provided they would attempt to settle the dispute through good faith negotiations, but if they could not, the terms of the original lease would apply.

In late 1982 GWBC objected to ASA's development proposal, which was called the Wasson plan. It showed a 68-acre development, to be implemented in 2 phases: a 20-acre complex, including 4 office buildings along Orangewood Avenue and a 48-acre development of an unspecified nature to be built along State College Boulevard. GWBC opposed the issuance of a conditional use permit for the project. The permit was issued and, after several meetings between GWBC and Anaheim failed to settle the dispute, GWBC filed this action.

The complaint sought: (1) specific performance of the 1964 and 1981 agreements; (2) a permanent injunction enjoining Anaheim and ASA from depriving GWBC of the use and enjoyment of any part of the stadium parking lot, from ousting it from possession of the lot, from modifying, reducing or depriving it of ingress, egress, and traffic flow as shown on the plans and specifications, and from developing construction projects on any portion of the parking lot; (3) a declaration of rights under the 1964 and 1981 agreements; (4) quieting of GWBC's title to its interest in the parking lot without any modifications; (5) a declaration that allowing any businesses on the parking lot which compete with GWBC's concessions is a breach of the 1964 and 1981 agreements; and (6) damages against ASA for interfering with GWBC's contractual relations with Anaheim. Anaheim and ASA alleged several affirmative defenses, notably estoppel and unclean hands. The trial court found GWBC had a leasehold interest in the stadium and parking lot, and the planned development would breach the agreements, but Anaheim could develop a portion of the lot as long as it did not materially affect

ingress and egress and preserved the ground-level parking spaces to which GWBC was entitled. The trial court also found Anaheim breached the 1981 amended lease by issuing a conditional use permit. It granted specific performance, an injunction, a declaration that GWBC has a leasehold in the premises subject to certain conditions, and quieted title in favor of GWBC. Although the court had severed the claim for intentional interference with contractual relations for a later jury trial, it entered judgment against GWBC on that cause of action.

I

GWBC contends the trial court erred by ruling Anaheim can develop part of the parking lot area provided the requisite minimum number of parking spaces remain. Anaheim and ASA respond that the trial court erred in finding the 1964 agreement between GWBC and Anaheim is a lease that precludes Anaheim from providing minimum parking under the agreement in any form it chooses, including multilevel parking structures. GWBC asserts the 1964 agreement was a lease, and the language giving Anaheim control of areas not necessary for parking was an invalid exclusion. Anaheim and ASA contend the agreement is not a lease, and even if it were, Anaheim properly reserved the right to develop the parking lot while providing the minimum parking.

The precise meaning of any contract, including a lease, depends upon the parties' expressed intent, using an objective standard. (*Medical Operations Management, Inc.* v. *National Health Laboratories, Inc.* (1986) 176 Cal.App.3d 886, 893 [222 Cal.Rptr. 455]; see *Kendall* v. *Ernest Pestana, Inc.* (1985) 40 Cal.3d 488, 500, 502-504 [220 Cal.Rptr. 818, 709 P.2d 837] [using contract approach to construe lease].) When there is ambiguity in the contract language, extrinsic evidence may be considered to ascertain a meaning to which the instrument's language is reasonably susceptible. (*Mission Valley East, Inc.* v. *County of Kern* (1981) 120 Cal.App.3d 89, 98 [174 Cal.Rptr. 300].) A great quantity of extrinsic evidence was admitted here without objection. This is understandable because ambiguities existed in the 1964 agreement concerning whether a lease was intended, whether GWBC had the right to the parking lot as originally constructed or only to a specified minimum number of parking spaces, the minimum number of spaces promised to GWBC, and where those spaces could be located.[2]

---

[2]ASA now objects to the extrinsic evidence, asserting that an objection at trial was unnecessary because as a substantive rule of law, extrinsic evidence cannot be used to support a meaning to which the agreement is not reasonably susceptible. (*Tahoe National Bank* v. *Phillips* (1971) 4 Cal.3d 11, 23 [92 Cal.Rptr. 704, 480 P.2d 320]; see also *Mission Valley East,*

We review the agreement[3] and the extrinsic evidence de novo, even if the evidence is susceptible to multiple interpretations, unless the interpretation depends upon credibility. (*Garcia* v. *Truck Ins. Exchange* (1984) 36 Cal.3d 426, 439 [204 Cal.Rptr. 435, 682 P.2d 1100].) If it does, we must accept any reasonable interpretation adopted by the trial court. (*In re Marriage of Fonstein* (1976) 17 Cal.3d 738, 746-747 [131 Cal.Rptr. 873, 552 P.2d 1169].) Not surprisingly, GWBC urges there were credibility conflicts, and substantial evidence supports the trial court's interpretation of the agreement. Anaheim and ASA stress the trial court's interpretation was unreasonable, and argue for a different de novo interpretation. We address those contentions after a review of the pertinent evidence.

*Negotiations Leading to the 1964 Agreement*

In April 1964 GWBC's attorney, Alfred Marshall, wrote a "Resume of Prospective Stadium Lease" stating GWBC's requirements, including a minimum 12,000-space parking lot, "exclusive right to use and occupy the Stadium premises" during baseball games, and operation of the stadium, concessions and parking lot. GWBC representative Cedric Tallis determined the requisite parking spaces based upon the minimum "level area" parking places needed for that size stadium. He stressed the importance of a "logical, practical site for the building of the stadium and the parking area on ground-level parking." The term "parking facilities" was intended to include "those parts of the parking lot necessary to operate and so forth, such as the access, egress, roads, the toll booths, the lanes to control traffic" and other traffic control systems.

During negotiations, Anaheim officials indicated the city would have no problem constructing the complex including "appropriate level parking facilities," contrasting it with the terraced parking lot at Dodger Stadium. When GWBC and Anaheim officials visited the proposed site, they noted it was "flat land." The possibility of high-rise parking structures was never discussed.[4]

Anaheim City Attorney Joseph Geisler rejected Marshall's initial effort, and Marshall rejected Anaheim Assistant City Attorney John Dawson's first

*Inc.* v. *County of Kern, supra*, 120 Cal.App.3d at p. 98.) We will consider whether the extrinsic evidence supports a reasonable interpretation of the agreement.

[3]Reference to "the agreement" refers to both the 1964 and the 1981 agreements where appropriate.

[4]There was conflicting testimony concerning whether the need for future parking structures was discussed. Giving appropriate deference to the trial court's implicit finding, we assume it was not.

draft, called an "exhibition agreement," which gave control of the premises to Anaheim. Geisler rejected Marshall's proposal because it precluded Anaheim from making other uses of the stadium and parking area necessary to its financial viability. During subsequent negotiations, Anaheim insisted on its right to use the parking area for commercial projects and sports activities to avoid monetary losses and the need for higher taxes. The city discussed other activities and uses for the approximately 146 acres Anaheim had acquired for the stadium complex. Anaheim City Manager Keith Murdoch "wanted to be sure that the wording in the final document . . . would allow sufficient flexibility [to Anaheim] to take advantage of such [other] opportunities."

The parties were concerned the County of Orange would levy a possessory interest tax and GWBC wanted Anaheim to indemnify it if one were imposed, but Anaheim expressed reluctance. Anaheim feared the leasehold interest GWBC proposed would allow imposition of the tax, and was also concerned a lease would limit its flexibility to develop other uses at the stadium complex, including a sports arena.

Nevertheless, Marshall insisted the agreement must be a lease. Geisler said certain adjustments were necessary for it to be acceptable. Marshall said he would try to accommodate Anaheim in the initial lease draft, but an exhibition agreement was out of the question. Marshall submitted a draft "Lease Agreement" dated June 4, 1964, giving operational control of the stadium and parking facilities to Anaheim. It required Anaheim to furnish all facilities and equipment, including "parking facilities," on game days. The parking facilities were mentioned to satisfy GWBC's concerns that Anaheim provide the 12,000-space minimum, given Anaheim's plans to build other facilities on the site.

The June 4 draft used the terms "lessor" and "demise and lease" and provided for "suitable parking facilities adequate to accommodate a minimum of 12,000 cars . . . ." The term "appurtenant and accessory facilities" included the parking lot and required that they be constructed according to "agreed plans and specifications." Marshall emphasized to Anaheim that this matter was of considerable importance. The draft provided Anaheim would "adequately operate and maintain the parking lots on the area indicated as such on the agreed plans and specifications." It also stated "no reduction or diminution" of those facilities could be made without GWBC's written consent.

The June 4 draft addressed the concerns regarding the potential possessory interest tax by highlighting the intermittent nature of the Angels' use, and

stating use of the facilities would be "only for the purpose of conducting . . . baseball games [as] scheduled." It also provided Anaheim would operate the stadium and parking lot on game days, which in Marshall's opinion would not change "the essential rights and interests of the parties." An April draft had provided GWBC would operate the facility. Marshall and Geisler recognized these changes were not intended to change the underlying substantive relationship of the parties, as originally stated in the April draft. Marshall said the language "lease and hire the use" was acceptable lease terminology, that "hiring the use includes one of the uses, the ability to sit or stand on and occupy the property."

In response to the June 4 draft, Anaheim presented another "Baseball Exhibition Agreement," which did not use the term "lease," instead referring to GWBC as the "Exhibitor," and granting control of the facilities to Anaheim. GWBC summarily rejected the proposal, wanting "something of more substance and something in the nature of an interest in the land rather than an Exhibition Agreement where they were hired by the City of Anaheim."

Marshall proffered another draft "Lease Agreement," dated June 18, which carried forward the basic provisions of the June 4 draft on parking facilities, except for adding the terms "pave" and "mark" in describing the lessor's obligation to provide parking. The draft removed the substantial restriction on future development and replaced it with recital A, which stated Anaheim wanted to build a "first-class public sports and activities center."[5]

Anaheim remained concerned over the "lease" label. Marshall prepared a memorandum on June 29, which referred to the agreement as a "contract right over a period of years to use publicly owned stadium facilities from time to time . . . ." He also noted use of terms such as "lease" or "permit" would not control the interpretation of the document, and conceded the agreement did not give GWBC a right of exclusive possession and control.

On July 31, Marshall and Geisler met with Tallis and Robert Reynolds of GWBC, and Anaheim representatives. Anaheim reiterated it had to realize additional revenues from other users and those uses would probably require "substantial changes in configuration and location" of the parking spaces. GWBC agreed the changes would not require its written consent as long as GWBC had a minimum of 12,000 parking spaces somewhere on the property. Although the labels in the various drafts changed, Anaheim was adamant it must have exclusive possession and control of the land.

---

[5]There was conflicting testimony concerning whether the purpose of recital A was to ensure Anaheim flexibility in future development or to minimize the risk of a possessory interest tax.

The potential for a possessory interest tax continued to complicate the negotiations. GWBC refused to be liable for the tax, insisting upon indemnification by Anaheim. Anaheim finally agreed to indemnity, although it did "not intend [ ] there would be [a need for it]," based primarily upon an informal opinion of the Orange County Counsel's Office. During discussions with the county counsel, Dawson said that although the parties "were contemplating a lease agreement, the use of the stadium by the Angels would be on an intermittent basis; in other words . . . it would not be a continuous use." Around this time, a new sentence was added to recital C which remained in the final agreement and gave Anaheim control of any part of the 146 acres not needed to provide the minimum parking with adequate entrances and exits.[6]

The final agreement stated GWBC "does hereby hire and lease from [Anaheim]: The use of the . . . stadium and accessory and appurtenant facilities . . . for the playing and exhibition of [the Angels'] home baseball games . . . ." Anaheim was to erect "a multi-purpose stadium with a seating capacity of approximately 45,000, and suitable parking facilities adequate to accommodate a minimum of 12,000 cars for stadium customers." A plot plan of the 146-acre site was attached to the agreement as exhibit A, with the area circumscribed in red. Anaheim agreed to complete construction by April 1966 "of the stadium and appurtenant and accessory facilities (including . . . parking facilities . . . ) . . . upon the agreed site in accordance with the agreed plans and specifications, with ingress, egress, and traffic flow systems to and from surrounding transportation networks . . . ."

It was further agreed that "the 146 acres . . . except to the extent occupied by the stadium, and to the extent necessary to provide the minimum parking for stadium use together with adequate egress and ingress, shall be under the exclusive control of [Anaheim] and is not in any way bound to use for [GWBC]." However, "[n]o reduction or diminution of any of the facilities . . . shall be made . . . without the advance written consent of [GWBC]."

GWBC agreed to pay the higher of a fixed percentage of the gate receipts or $160,000 a year to use the stadium. The agreement commenced on the date of the Angels' first home game in 1966 and continued through 2001, with an option for GWBC to extend the agreement for up to 30 years.

---

[6]There was conflicting evidence concerning whether the language was added to protect Anaheim's ability to develop in the future or to avoid imposition of a possessory interest tax.

*Establishment of the "Premises" and the Parking Facility*

The stadium and parking facilities were constructed according to agreed plans and specifications, incorporated into the lease agreement.[7] Before construction began, a stadium review committee, comprised of GWBC and Anaheim representatives and the architect, reviewed the plans.[8] The parking facilities were designed in great detail, including access roads, parking stall dimensions and traffic control systems.

To design facilities acceptable to all parties, it was necessary to use the entire 146-acre site, except a yet-to-be-acquired parcel in the northwest portion (designated the Wagner-Michel parcel).[9] No evidence showed the parking lot layout on opening day in 1966. The count used by the trial court, 12,422 automobile and 146 bus parking spaces, was done by an Anaheim employee in early 1967.

Over the years Anaheim made several unilateral changes to the parking area which increased total parking to over 15,000 spaces.[10] Formal approval from GWBC was not sought or obtained.

*Postagreement Conduct Bearing on Intent*

From 1966 to 1978, Anaheim developed proposals for additional uses for the stadium and parking area, including a drag strip, metroport, transportation center, and Amtrak station, and in each instance it sought GWBC's

---

[7]A diagram of the site is attached to the opinion as appendix A. It is derived from trial court findings and exhibits.

[8]There was conflicting evidence concerning whether plans and specifications for the parking lot were ever approved by endorsement of the parties. Although the trial court found exhibit 319 represented the final plans and specifications for the parking facilities, it also found that the as-built facilities did not conform to those specifications. One of the entrances shown on the plans was on the Wagner-Michel parcel and was not built because the parcel had not yet been purchased. When another entrance on Katella replaced it, the configuration of internal circulation roads and portions of the parking areas was changed. The southern boundary was extended south to abut a curve on Orangewood. There was no intention to acquire two small parcels referred to as parcel 39A and the railroad spur. Nonetheless, we adopt the trial court's finding on this topic insofar as it determines the parking facility was built *substantially* according to the plans and specifications approved by the parties. There was no evidence the parties questioned any deviations when the facility was completed.

[9]The parcel was obtained in 1966 through condemnation proceedings.

[10]By 1971, restriping and configuration changes had increased the total spaces to 13,200. The Katella entrance had been replaced by the Douglass Street access. Starting in 1978, game-day personnel parked on the Wagner-Michel lot. In 1980 another reconfiguration, including elimination of the "bus lot," increased the number of spaces to 13,540. By 1981 another restriping raised total spaces to over 14,000. Construction of an Amtrak station in 1983 and relocation of the "Big A" sign reduced the total spaces, but construction of the Orange freeway further east than originally planned added about seven acres of parking, increasing the number to over fifteen thousand.

input. GWBC always agreed to consider the proposals with the express understanding they would not interfere with GWBC's operations or reduce the facilities.[11]

During a deposition taken for the Wagner-Michel condemnation proceedings, Tallis testified Anaheim had final authority over changes to the parking lot and GWBC had no veto power over Anaheim projects. GWBC principal Gene Autry testified during his deposition that Anaheim had the power to relocate parking at its discretion, even a mile away if it chose to do so.[12]

Contrary to the parties' expectations, the County of Orange sought to impose a possessory interest tax on GWBC's interest in the property, and the issue was litigated in 1969. GWBC's verified complaint alleged that, except for its lease of office space at the stadium, all other portions of the property were in Anaheim's exclusive possession and control. It also alleged parking revenues were divided based on a contractual obligation and not any possessory rights. In a petition to the Orange County Assessment Appeals Board, GWBC asserted the labels "lessor" and "lessee" in the 1964 agreement were nominal verbiage, and the agreement was merely an exhibition contract. GWBC and Anaheim both argued the agreement did not create a taxable possessory interest.[13]

### The Amended and Restated Lease

In early 1980 GWBC and Anaheim began negotiations to amend the 1964 agreement, ostensibly to clarify the parties' stadium operation agreements which they had changed many times. During the negotiations, GWBC disputed Anaheim's right to modify the parking areas to accommodate ASA's development plans. The draft Anaheim Assistant City Attorney Jack

---

[11]There was conflicting testimony on what GWBC said in response to these proposals. By one account GWBC objected to any alteration of the parking as originally laid out. By another it did not care whether parking was in structures as long as 12,000 spaces remained. We accept the trial court's finding that GWBC's concern was that 12,000 ground-level spaces remain.

[12]The trial court allowed Tallis's statements for impeachment purposes only and gave little or no weight to Autry's. We will honor the trial court's use of that evidence.

[13]The trial court heard evidence on that litigation, but refused to take judicial notice of it. ASA contends the trial court erroneously excluded GWBC's brief, signed by Marshall, that recognized Anaheim's exclusive possession of the public areas of the stadium complex. It also contends the trial court improperly limited for impeachment purposes letters from Marshall to Dawson and Francis Leary in October 1972, which said the agreement was "in truth and in fact an 'exhibition contract' under the terms of which [GWBC] commits itself to perform all of its home games for exhibition in the City-owned and operated Stadium for a consideration paid by the City." Any error in those rulings was harmless because other evidence sufficiently showed GWBC disclaimed any possessory interest in the premises during those proceedings.

White sent to GWBC eliminated all references to "agreed plans and specifications" and "appurtenant and accessory facilities," which had the effect of eliminating the parking facility from the premises subject to the agreement. GWBC objected strongly, taking the position it was entitled to use all of the parking area as originally developed.

During November and December 1980, White drafted paragraph 12B to the proposed amended agreement to defer a determination of the parties' rights in the parking area. It acknowledged the ASA lease for development of part of the parking area and Anaheim's intent to relocate and redesign the parking facilities. It provided that the parties would attempt to agree upon plans and specifications for any modification before any building permit was issued. If the parties could not agree within a reasonable time, the rights under the 1964 agreement would remain in force.

In spring 1981, references to "plans and specifications" and "appurtenant and accessory facilities" were added to the amended lease draft, including the parking facilities in the definition of premises as it had been in the 1964 agreement. To reinforce the concept that the parties' intent underlying the amended agreement was to preserve, not modify, their respective rights and obligations concerning the parking facilities, the proposed amended agreement read, "[N]othing contained in this Agreement shall constitute a modification or waiver by [Anaheim] or [GWBC] of any rights they may otherwise have under [the] 1964 Agreement with respect to [the] parking facilities." The final agreement was labeled an "Amended and Restated" lease.

### The Trial Court's Findings

Based upon this evidence the trial court made express findings: When the agreement was signed on August 8, 1964, it was the final expression of the parties' intentions. It was a "true lease[ ] creating a landlord-tenant relationship between Anaheim and the Angels," based upon their "language, acts and conduct" before and after it was signed. "[GWBC is] entitled to 12,422 automobile parking spaces plus 146 bus spaces on ground level, together with adequate egress and ingress, no less than what they had at the beginning of the lease. . . . Stadium customers must have surface routes or roads for them to drive or walk to (ingress) and from (egress) their surface (ground level) parking spaces and stadium."

The trial court found the agreement was a lease based on several factors. As to some, the parties had no dispute. They were referred to as "lessor" and "lessee." The rental amount and manner of payment was stated, as well as the duration of the agreement.

There was a dispute as to whether the parties intended conveyance of a leasehold interest, whether GWBC was granted exclusive possession of the premises, and whether the description of the premises was adequate. As to the parties' intention, the trial court looked to the language used, including "demise and lease unto the lessee," and the prohibition against assignment. After an initial dispute over the nature of the agreement, all later drafts referred to it as a "Lease Agreement." The parties' statement that they "contemplated" there would be "no possessory interest taxes issued under [the] Agreement" was a reflection of their recognition GWBC's interest was virtually a leasehold or possessory interest. The 1978 agreement between Anaheim and ASA referred to the 1964 agreement as creating a leasehold. Anaheim referred to the agreement as a leasehold in answering the complaint in this action. The trial court found GWBC had exclusivity of possession even though the Angels did not use it on a year-round basis.

Concerning the description of the premises, the court found the parties intended Anaheim would build the stadium and parking facilities on the area outlined in red on exhibit A[14] to the 1964 agreement. The outlined area constituted approximately 149 acres, but was reduced to the agreed 146 acres after excluding 2 small parcels which were never developed. The area included the six-acre Wagner-Michel property.

Some provisions of the agreement had not yet been performed when it was signed. Anaheim had not acquired all of the property, the stadium and parking facilities had not been built, and the parties had not yet agreed on final plans and specifications because they did not exist. However, the parties cooperated to create and execute plans, so that when the complex was developed with 12,422 parking spaces for cars and 146 spaces for buses, it defined the leased premises.

The Angels played their first game in the new stadium on April 9, 1966. Any uncertainty or ambiguity about the description of the premises was eliminated when GWBC took possession and commenced performance. During its tenancy, GWBC released approximately five acres from the premises for an Amtrak station and a fraction of an acre for the "Big A" sign.

The trial court found the leased premises were defined by the metes and bounds description contained in an exhibit, excepting the Wagner-Michel parcel, the Amtrak station, and the "Big A" sign area. However, any portion of the premises not needed to provide the 12,422 automobile and 146 bus parking spaces remained under Anaheim's exclusive control and was not

[14]That area is identified on appendix A.

bound to use for GWBC. There was strong evidence the intent of the agreement "was not to limit Anaheim to giving [*sic*] [GWBC] the entire 146 acres but only that portion which provided [GWBC] 'suitable parking facilities adequate to accommodate a minimum of 12,000 cars for stadium customers' and 'adequate egress and ingress.' "

Both the 1964 agreement and the 1981 amended agreement provided that no reduction or diminution of the facilities, including the parking area, could occur without GWBC's advance written consent, meaning Anaheim could not unilaterally reduce the number of spaces or the entrances or exits. However, that language did not prohibit Anaheim from rearranging or relocating the surface parking spaces and entrances and exits within the leasehold premises as long as the minimum number was preserved. That interpretation was consistent with the conduct of the parties over the years, including Anaheim's restriping and rearranging of the spaces on several occasions without objection by GWBC.

*Characterizing the 1964 Agreement*

 We agree with the *factual* aspect of the trial court's findings.[15] The parties intended to establish a relationship which gave GWBC exclusive possession and control of the stadium and parking facility for that part of game days needed for the scheduled Angels games. The parking facility was to contain a minimum of 12,000 ground-level parking spaces with adequate ingress, egress, and circulation. The stadium and parking facility were to be constructed based on agreed plans and specifications, and were completed with the parties' participation and agreement. Any part of the parking facility not necessary to provide the required minimum parking with appropriate circulation could be used by Anaheim for other purposes. Any development which infringed upon GWBC's parking rights required its written permission.

We disagree, however, with the trial court's legal conclusion that the 1964 agreement was a lease. To establish a lease the agreement must show " 'the parties intend to create a landlord-tenant relationship [citations] and must contain the following: a designation of the parties, a description of the premises, the rent to be paid, the time and manner of payment, and the term for which the tenant will rent the property.' [Citation.]" (*Santa Monica Rent Control Bd.* v. *Bluvshtein* (1991) 230 Cal.App.3d 308, 316-317 [281 Cal.Rptr. 298].) As the trial court noted, the only requirement in dispute here is whether the parties intended a landlord-tenant relationship.

---

[15]This is so whether we review the evidence de novo or use the substantial evidence test. (See *Garcia* v. *Truck Ins. Exchange, supra,* 36 Cal.3d at p. 439; *In re Marriage of Fonstein, supra,* 17 Cal.3d at pp. 746-747.)

Both the language used in the agreement and the extrinsic evidence is ambiguous. Terms such as "lessor," "lessee," and "demise and lease" indicate a lease, as do the provisions prohibiting assignment and requiring GWBC to carry property insurance. (See *Darr* v. *Lone Star Industries, Inc.* (1979) 94 Cal.App.3d 895, 900 [157 Cal.Rptr. 90] [such labels are evidence but are not binding]; see also *Beckett* v. *City of Paris Dry Goods Co.* (1939) 14 Cal.2d 633, 637 [96 P.2d 122] [use of lease terms and prohibition against assignment]; *Wells Nat. Services Corp.* v. *County of Santa Clara* (1976) 54 Cal.App.3d 579, 584-585 [126 Cal.Rptr. 715] [prohibition against assignment connotes a lease].) Provisions limiting GWBC's use to conducting baseball games and giving Anaheim control over concessions and parking can be construed either way.

On the other hand, the agreement only purports to lease "the use" of the stadium and facilities for the playing and exhibition of baseball games, using the term "exclusive" only in conjunction with GWBC's occupation of its stadium offices. There is no precise legal description. (See *O'Shea* v. *Claude C. Wood Co.* (1979) 97 Cal.App.3d 903, 909-910 [159 Cal.Rptr. 125] [lack of precise description was evidence parties did not intend exclusive possession]; but see *Mabee* v. *Nurseryland Garden Centers, Inc.* (1978) 84 Cal.App.3d 968, 971-972 [149 Cal.Rptr. 105] [finding a leasehold in premises denoted by a red line on a plot plan and approximate dimensions, with a specific description to be provided later].) The agreement was never recorded, as leases often are. And, as ASA points out, the language prohibiting diminution of the facilities without GWBC's consent is superfluous if GWBC has a leasehold.[16]

Evidence of the parties' conduct before and after the agreement was executed is also inconclusive. From the outset, GWBC demanded more than just a contract to exhibit baseball games. Lease terminology was included throughout all of the drafts. In the 1978 ground lease, Anaheim and ASA referred to GWBC's interest as a "leasehold."[17] Conversely, Marshall represented in June 1964 that "the Angels would not have exclusive possession and control as against all persons, including the owner, during the term of

---

[16]Anaheim argues recital C's language giving it control over unused portions of the parking area is inconsistent with a lease, but as we shall discuss, it is consistent with an exclusion or reservation under a lease. Similarly, lease language that the parties contemplated no possessory interest tax would be imposed is balanced by the provision Anaheim would indemnify GWBC if one were imposed. We disagree with the trial court's conclusion the former language expressed an intent to create a leasehold.

[17]Anaheim "admitted" in its answer that GWBC was a lessee of the stadium and had certain parking rights. The trial court did not treat it as a judicial admission as evidence (see *People* v. *Bestline Products, Inc.* (1976) 61 Cal.App.3d 879, 921-922 [132 Cal.Rptr. 767]), the issue was heavily contested at trial and the evidentiary value was miniscule.

the lease. . . . [T]he Angels would only be given the use of [the] multi-purpose stadium for the playing and exhibition of their baseball games in the baseball season on the dates and at the times to be designated or agreed upon in accordance with the terms of the lease." He also indicated that "[Anaheim] . . . would not be excluded from possession and control, but would . . . throughout the term of the lease remain in possession and control, actively engaged with its own personnel in the business of running a stadium." GWBC's position during the Wagner-Michel condemnation proceedings and the possessory tax litigation conformed to those statements.

All of these circumstances are consistent with the conclusion the parties *intended* for GWBC to have exclusive use of the stadium and facilities on game days with Anaheim retaining possession and control on other occasions, and *hoped* that relationship would be insufficient to trigger the possessory interest tax. Substantial evidence supported the trial court's findings in that regard, and we reach the conclusion independently as well. (See *Garcia* v. *Truck Ins. Exchange, supra,* 36 Cal.3d at p. 439; *In re Marriage of Fonstein, supra,* 17 Cal.3d at pp. 746-747.)

But the inquiry does not end there. "The distinguishing characteristics of a leasehold estate are that the lease gives the lessee the exclusive possession of the premises against all the world, including the owner [citation], and its term is limited to endure for a definite and ascertained period, however short or long the period may be. [Citation.]" (*Howard* v. *County of Amador* (1990) 220 Cal.App.3d 962, 972 [269 Cal.Rptr. 807].) We must decide whether, as a matter of law, possession and control of the stadium premises on approximately 81 dates which vary from year to year can be considered "exclusive against all the world including the owner," where the owner operates all concession and parking facilities and provides security. We make that determination using an objective standard and not by accepting the literal language of the instrument. (*Stadium Concessions, Inc.* v. *City of Los Angeles* (1976) 60 Cal.App.3d 215, 223 [131 Cal.Rptr. 442].)

Government Code section 37396 allows municipalities to lease property they own for stadium or exhibition purposes. But the section does not purport to change the common law requirements for a lease. GWBC cites numerous decisions which assumed the professional sports team involved had a leasehold in stadium premises, but none decided the nature of the occupant's property interest. (See *National Exhibition Co.* v. *City and County of San Francisco* (1972) 24 Cal.App.3d 1 [100 Cal.Rptr. 757]; *City of Cincinnati* v. *Cincinnati Reds* (1984) 19 OhioApp.3d 227 [483 N.E.2d 1181]; *Cincinnati Riverfront Coliseum, Inc.* v. *City of Cincinnati* (S.D.Ohio 1983) 556 F.Supp. 664; *International Soc. for Krishna Consciousness, Inc.* v. *New*

*Jersey Sports and Exposition Authority* (D.N.J. 1981) 532 F.Supp. 1088; *Atlantic Rural Exposition, Inc.* v. *Fagan* (1953) 195 Va. 13 [77 S.E.2d 368, 37 A.L.R.2d 378].) None of those cases addressed whether sporadic use of premises, with shared control by the owner during each use, could ever be deemed "exclusive" of the owner's possession.[18] It cannot.

Although we have found no California cases on point, several out-of-state cases support our conclusion. In *Charlton* v. *Champaign Park Dist.* (1982) 110 Ill.App.3d 554 [66 Ill.Dec. 354, 442 N.E.2d 915], the court found an agreement allowing a company to operate a water slide and concessions in a public park was not a lease where the company only operated the slide during part of the year and the government agency retained control over pricing and conduct of the company's employees. (*Id.* at p. 918.) In *Hayden* v. *City of Houston* (Tex.Civ.App. 1957) 305 S.W.2d 798, the court found an agreement, although labeled a lease, for operation of the city's parking lot adjacent to its airport was not a lease where the city retained control over what areas would be designated for free and metered parking, and the "lessee" had to allow any member of the general public to park as long as the requisite fee was paid. (*Id.* at p. 801.) In *Illinois Central R. Co.* v. *Michigan Central R. Co.* (1958) 18 Ill.App.2d 462 [152 N.E.2d 627], the court found an agreement for occupancy and use of one rail company's terminal by another was not a lease, although that term was used. The owner retained general control, management and regulation of the terminal and grounds, and it could make improvements and additions as long as the user's rights were not materially impaired. (*Id.* at p. 636.)

We have found only one California case suggesting an arrangement for sporadic occupancy of premises can constitute a lease. In *Cal-Am Corp.* v. *Department of Real Estate* (1980) 104 Cal.App.3d 453 [163 Cal.Rptr. 729, 6 A.L.R.4th 1281], the trial court found the time-shares Cal-Am sold to use condominium vacation facilities were "an interest in property" subject to Department of Real Estate regulation. Although the court found it "unnecessary" to classify the interest for resolution of the appeal, it opined the interest was a leasehold, even though the occupancy dates and the structure occupied could vary from year to year. (*Id.* at pp. 456-458.)

---

[18]Similarly inapposite are "lodger" cases cited by Anaheim and ASA. (E.g., *Stowe* v. *Fritzie Hotels, Inc.* (1955) 44 Cal.2d 416, 421 [282 P.2d 890]; *Erwin* v. *City of San Diego* (1952) 112 Cal.App.2d 213, 217 [246 P.2d 105].) One who merely stays for a relatively brief time in a hotel, motel, or rooming house cannot be said to have an interest analogous to GWBC's 35-year right, with a 30-year option, to use the stadium. (See *Bullock* v. *City and County of San Francisco* (1990) 221 Cal.App.3d 1072, 1097-1099 [271 Cal.Rptr. 44].)

Even if we accepted the conclusion of that dictum,[19] the case is distinguishable. Here, on the dates GWBC occupies the stadium premises, its activities are limited to exhibiting baseball games. Anaheim controls virtually all other functions. The sporadic occupancy is not even exclusive.[20] The only way to view this relationship as a lease would be to say GWBC exclusively controls the premises but hires Anaheim to provide concession, parking, and security services, and virtually every service other than playing baseball. Such a construction would allow the tail to wag the dog.

Our conclusion Anaheim conveyed less than a leasehold estate is bolstered by the rule that conveyances are construed in favor of a public entity when it makes a grant to a private party. (Civ. Code, § 1069.) By its terms, section 1069 deals with transfers of title, but we know of no reason not to apply it to a public entity's grant of substantial rights to use public property.

Numerous cases finding "possessory interests" for property tax purposes are not instructive. (See, e.g., *Freeman* v. *County of Fresno* (1981) 126 Cal.App.3d 459, 462-464 [178 Cal.Rptr. 764]; *Seatrain Terminals of California, Inc.* v. *County of Alameda* (1978) 83 Cal.App.3d 69, 81 [147 Cal.Rptr. 578]; *Stadium Concessions, Inc.* v. *City of Los Angeles, supra,* 60 Cal.App.3d at pp. 223-224; *Wells Nat. Services Corp.* v. *County of Santa Clara, supra,* 54 Cal.App.3d at p. 585; *Sea-Land Service, Inc.* v. *County of Alameda* (1974) 36 Cal.App.3d 837, 842-843 [112 Cal.Rptr. 113].) At one time imposition of a possessory interest tax required possession tantamount to a lease, " 'exclusive . . . against all the world, including the [rightful] owner.' " (*Kaiser Co.* v. *Reid* (1947) 30 Cal.2d 610, 619 [184 P.2d 879], italics omitted.) Later cases relaxed that standard, requiring only that the possession be exclusive as against members of the general public (*Freeman* v. *County of Fresno, supra,* 126 Cal.App.3d at pp. 462-464), or something more than a right in common with others (*United Air Lines, Inc.* v. *County of San Diego* (1991) 1 Cal.App.4th 418, 427- 428 [2 Cal.Rptr.2d 212]).[21] Only one case involved an agreement where the possession could be sporadic, although on the facts

[19]The dictum can be justified by noting that even though no single owner had continuous exclusive possession of the premises, all of the "time sharers" collectively did have it.

[20]In *Beckett* v. *City of Paris Dry Goods Co., supra,* 4 Cal.2d 633, the lessor dry goods company maintained substantial control over certain aspects of the lessee's optical practice in a part of store, including the location of the optical department. The Supreme Count found there was a lease despite that control. (*Id.* at pp. 636-637.) But unlike this case, the optician's occupancy was uninterrupted and the company's employees did not have joint occupancy of the optical department while the optician performed his services.

[21]ASA suggests that trend was spawned by *El Tejon Cattle Co.* v. *County of San Diego* (1966) 64 Cal.2d 428 [50 Cal.Rptr. 546, 413 P.2d 146]. There the Supreme Court found a "lease" of land for grazing use only constituted a taxable possessory interest. The court did not discuss whether the lessee's possession was exclusive as against the owner. (*Id.* at pp. 430-431.) Nevertheless, the decision apparently coincided closely with a more relaxed

it was not. (*Sea-Land Service, Inc.* v. *County of Alameda, supra,* 36 Cal.App.3d at p. 842.)

But what is GWBC's interest if not a lease? We suggest two possibilities, but conclude it is of no moment to the outcome of this case.

■ An easement is an interest in land which is not an estate (*Darr* v. *Lone Star Industries, Inc., supra,* 94 Cal.App.3d at p. 901), as is a lease. It is a nonpossessory interest. (*Ibid.*; but see *Hubbard* v. *Brown* (1990) 50 Cal.3d 189, 194, fn. 2 [266 Cal.Rptr. 491, 785 P.2d 1183] [not deciding the issue, but noting easements have been construed as possessory interests for property tax purposes].) While a lease vests exclusive possession in the lessee, the holder of an easement merely has a right to use the property. (*Colvin* v. *Southern Cal. Edison Co.* (1987) 194 Cal.App.3d 1306, 1312 [240 Cal.Rptr. 142]; *Darr* v. *Lone Star Industries, Inc., supra,* 94 Cal.App.3d at p. 901; 4 Witkin, Summary of Cal. Law (9th ed. 1987) Real Property, § 434, p. 614; 5 Miller & Starr, Cal. Real Estate (2d ed. 1989) Easements, §§ 15:4-15:5, pp. 400-402.)

An easement is usually created by a deed, but it may be created by contract even though it does not contain formal words of conveyance and has not been recorded. (See *Wolford* v. *Thomas* (1987) 190 Cal.App.3d 347, 354-355 [235 Cal.Rptr. 422] [assuming inferentially a letter was sufficient to convey a grant of easement]; *Rice* v. *Capitol Trailer Sales of Redding* (1966) 244 Cal.App.2d 690, 692 [53 Cal.Rptr. 384]; *Buehler* v. *Reilly* (1958) 157 Cal.App.2d 338, 341-343 [321 P.2d 128]; *Zimmerman* v. *Young* (1946) 74 Cal.App.2d 623, 625-626 [169 P.2d 37] [recordation unnecessary]; 5 Miller & Starr, *supra,* Easements, § 15:14, p. 435.) It may be granted for a fixed period or in perpetuity. (*Darr* v. *Lone Star Industries, Inc., supra,* 94 Cal.App.3d at p. 900.) The holder of the easement may be granted exclusive use of the premises (*Otay Water Dist.* v. *Beckwith* (1991) 1 Cal.App.4th 1041, 1047-1048 [3 Cal.Rptr.2d 223]), but the grantor retains every incident of ownership, and may make any use of the land not inconsistent with the easement (*Camp Meeker Water System, Inc.* v. *Public Utilities Com.* (1990) 51 Cal.3d 845, 867 [274 Cal.Rptr. 678, 799 P.2d 758]).

Here, Anaheim granted to GWBC the use of the stadium and parking facilities on certain dates, retaining the right to use the property as it chose on all other occasions, and the right to build in the parking area as long as GWBC had the use of at least 12,000 ground-level parking spaces. This use is analogous to the limited interests granted in *Darr* v. *Lone Star Industries,*

definition of exclusivity used by assessors in 1967. (See discussion in *Metropolitan Stevedore Co.* v. *County of Los Angeles* (1972) 29 Cal.App.3d 565, 573-574 [105 Cal.Rptr. 595].)

*Inc., supra,* 94 Cal.App.3d at page 895 (the right to construct and use a bridge to haul gravel over state property) and *Colvin* v. *Southern Cal. Edison Co., supra,* 194 Cal.App.3d at page 1312 (placement of utility poles).

Alternatively, the interest might be described as an irrevocable license. ▇ A licensee has express or implied authority from the owner to perform an act or acts upon property. Like an easement, it is an interest in property which is less than an estate. (*O'Shea* v. *Claude C. Wood Co., supra,* 97 Cal.App.3d at p. 909.) A primary distinction is that a license is normally revocable at will. (*Ibid.*) Although a license which is not terminable at will is somewhat anomalous (5 Miller & Starr, *supra,* Easements, § 15:2, p. 395), it has been recognized. (*Nahas* v. *Local 905, Retail Clerks Assn.* (1956) 144 Cal.App.2d 808, 820 [301 P.2d 932]; accord, *O'Shea* v. *Claude C. Wood Co., supra,* 97 Cal.App.3d at pp. 907, 909.) The relationship between GWBC and Anaheim fits within the concept of a license irrevocable for the term of the agreement.

Ultimately, the label given to GWBC's "interest" is of little importance. Arrangements between landowners and those who conduct commercial operations upon their land are so varied that it is increasingly difficult and correspondingly irrelevant to attempt to pigeonhole these relationships as "leases," "easements," "licenses," "profits," or some other obscure interest in land devised by the common law in far simpler times. Little practical purpose is served by attempting to build on this system of classification. (See *Kendall* v. *Ernest Pestana, Inc., supra,* 40 Cal.3d at pp. 500, 502-504 [using contract principles to construe a lease]; see also *Eltinge & Graziadio Dev. Co.* v. *Childs* (1975) 49 Cal.App.3d 294, 297-298 [122 Cal.Rptr. 369] [same]; 6 Miller & Starr, Cal. Real Estate (2d ed. 1989) Landlord and Tenant, § 18:17, p. 34 ["Modern decisions tend to construe leases and the rights and obligations ensuing therefrom in accordance with general contract principles."].)

The agreement here granted certain rights and imposed certain duties on the parties. Our task is to determine the scope of these rights and duties. To say we cannot do so without first determining whether the agreement is a lease, an easement, or some other interest in land ignores modern commercial realities.[22] The contractual relationship between the parties must be

---

[22]When the common law developed its elaborate structure of labels for property interests, land was the primary form of wealth and considered so unique as to deserve special consideration in the court. This is no longer infallibly true. Modern commercial practice tends to consider the right to use as just another commodity. The law, in keeping with this development, should not stifle commercial real estate transactions by attempting to force contracts creating land rights into a Victorian corset, unsuited to late 20th century.

analyzed based on the evidence and findings without regard to its classification under traditional common law concepts.[23]

### GWBC's Parking Rights

 With these considerations in mind, we consider the trial court's ruling concerning GWBC's parking rights. That determination depends in large part on the language contained in recital C giving Anaheim the power to control that part of the property not required for minimum parking, and adequate ingress and egress. GWBC claims the recital should be ignored because: (1) the 1981 agreement eliminated recital C; (2) it is merely a recital with no operative effect; (3) it is an invalid exception to the lease because it is uncertain; and (4) even if it is not a lease, the agreement gives GWBC control over the parking lot so that no construction can take place on it without GWBC's written consent.[24]

Contrary to GWBC's argument, the 1981 agreement did not eliminate recital C. Although it did not restate the recital, it did announce the agreement was an "Amended *and Restated*" (italics added) lease and was not intended to modify any parking rights under the 1964 agreement. It also specified that if the parties could not settle their parking dispute, the rights under the 1964 agreement would apply. The language demonstrates recital C continued to have operative effect. And, of course, any ambiguity must be construed in favor of Anaheim. (See *Machado* v. *Southern Pacific Transportation Co.* (1991) 233 Cal.App.3d 347, 352-353 [284 Cal.Rptr. 560] [reservations are to be construed in favor of the grantor]; see also Civ. Code, § 1069.)

GWBC urges recital C was merely a recital with no operative effect, because Civil Code section 1068 allows recourse to recitals only if the words of a grant are in doubt. But recital C is not a recital, despite its label. It is not a mere recitation of facts, but contains the operative language[25] that the area not needed for minimum parking and adequate ingress and egress "shall be under the exclusive control of [Anaheim] and is not in any way bound to use for [GWBC]."

Even if it is a "mere" recital, recourse to it is necessary, as the trial court found, to interpret the language in the body of the agreement referring to

---

[23]The ability to do so becomes ever more important in an age where government entities frequently enter into creative agreements with sports teams and other business endeavors.

[24]This contention subsumes GWBC's related claims that recital C conflicts with language in the body of the agreement prohibiting "reduction or diminution of the facilities" without GWBC's advance written consent, and that no land was available for the exception because all of the 146 acres was used for the lot.

[25]"It is understood and agreed . . . ."

"use of the *aforesaid* stadium and accessory and appurtenant facilities" as the subject of "the lease of the use" which Anaheim conveyed. (Italics added.) And reference to recital C is also necessary to determine what portion of the 146 acres "furnished by [Anaheim]" is subject to the requirement that GWBC give its consent before any reduction or diminution occurs. (Civ. Code, § 1068; *Walton* v. *City of Red Bluff* (1991) 2 Cal.App.4th 117, 124 [3 Cal.Rptr.2d 275].) It establishes that the area not needed to provide minimum parking is reserved to Anaheim, and in a sense has not been "furnished."

Relying on cases we view charitably as "well seasoned," GWBC argues that recital C constitutes an exception to the leasehold grant and is void for uncertainty because the area to be used for any future development is not well defined. (See, e.g., *Lange* v. *Waters* (1909) 156 Cal. 142, 145-147 [103 P. 889]; *Massetti* v. *Madera Canal & Irr. Co.* (1937) 20 Cal.App.2d 708, 717-718 [68 P.2d 260]; *Simpson* v. *Schurra* (1928) 91 Cal.App. 640, 648-649 [267 P. 384].) Even if this rule of law still thrives, GWBC's argument fails because we have concluded the agreement was not a lease. (But see *Willard* v. *First Church of Christ, Scientist* (1972) 7 Cal.3d 473, 476-478 [102 Cal.Rptr. 739, 498 P.2d 987] [questioning the viability of feudal conveyance forms and focusing on the grantor's intent].)

Even assuming the agreement created a lease, GWBC's assertion is not well taken for at least two reasons. First, the rule regarding uncertainty does not apply when the location of the excepted property is left to the grantor's discretion. (See *Eldridge* v. *Burns* (1978) 76 Cal.App.3d 396, 418-419 [142 Cal.Rptr. 845], citing with approval *Stockwell* v. *Lindeman* (1964) 229 Cal.App.2d 750, 754 [40 Cal.Rptr. 555].) Second, an *exception* concerns premises already in existence when the grant is made while a *reservation* is a new interest created from the demised premises. (See 5 Miller & Starr, *supra*, Easements, § 15:18, p. 445; see *Cherokee Valley Farms, Inc.* v. *Summerville Elementary Sch. Dist* (1973) 30 Cal.App.3d 579, 587-588 [106 Cal.Rptr. 467].) Since the stadium and facilities had not yet been constructed when the agreement was executed, recital C must be construed as a reservation of a new interest rather than an exception of part of the original estate conveyed. Reservations have not been subjected to the void-for-vagueness rule of exceptions. (5 Miller & Starr, *supra*, Easements, § 15:18, pp. 445-446.)[26]

Finally, even if the agreement is not a lease, GWBC asserts it was granted control over the parking lot, and no construction can take place on it without

---

[26]This answers GWBC's allegation that the judgment was void for vagueness because it enforced the purported exception.

GWBC's written consent. This argument is premised on the contention that Anaheim could only use property not occupied by the parking lot as originally configured and constructed. But recital C does not indicate that Anaheim may use the area not occupied by the parking *lot.* It says Anaheim may use the area "except to the extent occupied by the stadium, and to the extent necessary to provide the minimum *parking* for stadium use" (italics added), in other words 12,000 spaces. If this language in the nature of a reservation is at all ambiguous, we construe it in favor of Anaheim, the government entity grantor. (Civ. Code, § 1069; *Machado* v. *Southern Pacific Transportation Co., supra,* 233 Cal.App.3d at pp. 352-353.)

We can reconcile recital C's language and the requirement for GWBC's written consent before any reduction or diminution of the facilities: The parking "facilities" to be controlled by GWBC are 12,000 ground-level spaces contiguous to the stadium and reasonable ingress and egress to them. To the extent Anaheim intended any reduction or diminution of that number of spaces, or ingress or egress, GWBC's written consent is required. Anaheim retains full control and discretion over any area not needed for those spaces and adequate ingress and egress.

The parties' statements and conduct before and after the agreement was executed are consistent with this interpretation. (*Okun* v. *Morton* (1988) 203 Cal.App.3d 805, 816 [250 Cal.Rptr. 220] [postagreement conduct may be used to resolve ambiguities].) Anaheim's witnesses testified, and the trial court found, this was the parties' intent in drafting recital C.[27] After the agreement was executed, Anaheim consistently sought GWBC's input concerning any development affecting the number of parking spaces, and GWBC only expressed concern that 12,000 ground-level spaces be preserved. There was no evidence GWBC objected or argued its written consent was required when the Amtrak and "Big A" parcels were subtracted from the parking area, no doubt because more than 12,000 ground-level spaces remained available.[28]

### *The Minimum Number of Required Spaces*

The trial court found GWBC was entitled to 12,422 car spaces and 146 bus spaces. Although that was the number of spaces Anaheim originally provided, nothing in the agreement indicates its obligation was to provide more than the minimum. Nor does the postagreement conduct of the parties

---

[27]We would make the same finding de novo.

[28]Cases GWBC cites concerning implied easements to protect commercial lessee's parking rights are inapposite because none involved express terms setting forth the right of the parties. (See, e.g., *Wilson* v. *Abrams* (1969) 1 Cal.App.3d 1030 [82 Cal.Rptr. 272].)

indicate a contrary result. GWBC demanded on various occasions that 12,000 spaces be maintained, never mentioning the figure of 12,422 nor any bus spaces. When the bus spaces were deleted, GWBC voiced no opposition. The judgment should be amended to indicate Anaheim need only provide the minimum 12,000 automobile spaces.[29]

### Use of Parking Structures

■ The trial court correctly concluded the parties intended the parking would be on ground level. Although there was some testimony to the contrary, a consistent theme during the original negotiations was GWBC's desire for more convenient parking than existed at Dodger Stadium and for ground-level spaces. The stadium parking lot was built that way using plans and specifications agreed to by GWBC and Anaheim, and although GWBC assented to relocation of parking spaces over the years, it never allowed parking structures.

### Location of Parking Spaces

■ We must decide in what area Anaheim may provide the required spaces. The trial court devoted considerable attention to what constituted the leasehold premises. It concluded the area denoted in red on exhibit A to the 1964 agreement, with the exception of the railroad spur parcel and parcel 39A (which Anaheim never acquired), the Wagner-Michel parcel (which the city acquired by condemnation after the stadium opened), and the Amtrak and "Big A" sign parcel exclusion (to which GWBC never objected), constituted the premises. The court excluded two state property parcels which became available for parking when the Orange freeway was built farther to the east than anticipated. It failed to mention the strip along Orangewood Avenue which was not included in the area circumscribed in red on exhibit A, but which was paved and used from the outset. (See appen. A.) In the judgment the court used a metes and bounds description to define the area.[30]

The trial court unreasonably limited the boundary of the area within which Anaheim may locate the requisite parking spaces. "[U]se, foreseeable use, and acquiescence fix the limits of an easement." (*Pacific Gas & Elec. Co. v. Hacienda Mobile Home Park* (1975) 45 Cal.App.3d 519, 528 [119 Cal.Rptr.

[29]By making this finding, we do not suggest Anaheim should eliminate parking for buses or other facilities which encourage mass transit or car pooling. Although the parties concluded 146 spaces were not necessary, bus parking has always been provided.

[30]Anaheim refers to the metes and bounds description as "highly speculative" but fails to demonstrate how it is defective. We assume it correctly describes the area the court found to constitute the leasehold.

559]; see also *Colvin v. Southern Cal. Edison Co., supra,* 194 Cal.App.3d at p. 1313 [easements and licenses need not have boundaries other than those of the servient tenement]; *Kosich v. Braz* (1967) 247 Cal.App.2d 737, 739 [56 Cal.Rptr. 52] [parties may relocate an easement by consent implied by use and acquiescence]; 5 Miller & Starr, *supra,* Easements, § 15:48, p. 518; 4 Witkin, *supra,* Real Property, § 446, p. 627.)[31] If GWBC's interest is viewed as a license or simply a contract right, the parking boundaries are similarly unconstrained. (See *Colvin v. Southern Cal. Edison Co., supra,* 194 Cal.App.3d at p. 1312.)

When the 1964 agreement was executed, the parties anticipated the Wagner-Michel parcel would be part of the area used. After it was acquired, it was used, albeit for staff parking. Likewise, although not a part of the originally denoted area, the Orangewood strip and the state parcels have been used for parking since their acquisition and conversion to parking areas. Neither GWBC nor Anaheim complained about their use for Angel game parking. They are all contiguous to the stadium, as the parties obviously contemplated the parking areas would be, and in some cases are closer to the stadium than portions of the parking lot as it existed on opening day. They must be added to the judgment's description of the areas upon which the minimum parking may be located.[32]

### Propriety of the Wasson Plan

The judgment should be modified in one other respect. This suit was prompted by Anaheim's intention to proceed with, and GWBC's opposition to, the Wasson plan. GWBC sought a declaration of the parties' rights under the 1964 and 1981 agreements, but the trial court made no express finding on the Wasson plan issue.

A reviewing court may make additional findings under Code of Civil Procedure section 909 where, as here, jury trial is not a matter of

[31]In *Wilson v. Abrams, supra,* 1 Cal.App.3d 1030, the court found the owner of property subject to a parking easement could not erect a gas station on part of the parking area even if he could show adequate parking remained for the existing shopping center. (*Id.* at pp. 1034-1036.) However, the easement in *Wilson* was defined by a fixed area, while the easement here is for 12,000 spaces.

[32]The same result would obtain even if we construed the agreement as a lease. The extent of the leased premises, when ambiguous, may be established by the conduct of the parties. (See 4 Witkin, *supra,* Real Property, § 546, p. 715; 6 Miller & Starr, *supra,* Landlord and Tenant, § 18:20, p. 47.) And, the site of the leased premises may be moved around the owner's property by mutual consent without affecting the validity of the lease. (*Cal-Am Corp. v. Department of Real Estate, supra,* 104 Cal.App.3d at pp. 458-459, citing *Beckett v. City of Paris Dry Goods Co., supra,* 14 Cal.2d at p. 635.) Here the parties showed by their conduct a mutual intent that all of Anaheim's contiguous property on the stadium site could be used for parking.

right.[33] The power created by the statute is discretionary and should be invoked sparingly, and only to affirm the case. (*Philippine Export & Foreign Loan Guarantee Corp.* v. *Chuidian* (1990) 218 Cal.App.3d 1058, 1090 [267 Cal.Rptr. 457].) This case presents an ideal occasion to apply it.

By its terms, a primary focus of Code of Civil Procedure section 909 is to avoid additional protracted post-appeal litigation. That is particularly apt here, where litigation expenses have obviously run into the millions of dollars. The lawsuit, or at least that part of it devoted to determining the parties' rights under the 1964 and 1981 agreements, should be finally resolved now. Absent additional findings by this court, further action by Anaheim on the Wasson plan would spur new rounds of litigation. A remand for further findings by the trial court would undoubtedly foster another appeal. (See *Conservatorship of Hart* (1991) 228 Cal.App.3d 1244, 1257 [279 Cal.Rptr. 249].)

 The parties agree the State College Boulevard portion of the Wasson plan cannot be implemented while maintaining the requisite 12,000 ground-level parking spaces. We find the evidence establishes the Orange-wood portion of the plan can be developed without reducing ground-level parking below 12,000 spaces or materially reducing or diminishing ingress or egress.[34] The judgment should be modified accordingly.

## II

 Anaheim and ASA assert GWBC should have been estopped from obtaining any equitable relief due to its statements and conduct and was guilty of unclean hands. Substantial evidence supports the trial court's finding the defenses were not established. (*County of Sonoma* v. *Rex* (1991) 231 Cal.App.3d 1289, 1296 [282 Cal.Rptr. 796].)

---

[33]The section provides in relevant part: "In all cases where trial by jury is not a matter of right . . . the reviewing court may make factual determinations . . . in addition to those made by the trial court. The factual determinations may be based on the evidence adduced before the trial court either with or without the taking of evidence by the reviewing court. . . . This section shall be liberally construed to the end among others that, where feasible, causes may be finally disposed of by a single appeal and without further proceeding in the trial court except where in the interests of justice a new trial is required on some or all the issues."

[34]The Orangewood development necessitates moving the Orangewood Avenue entrance to the east and having patrons exit through a path between the new buildings. This does not reduce or diminish the ingress or egress. GWBC's Arthur Patterson testified he believed the new configuration would cause traffic congestion in the parking lot once vehicles had entered, and it would be more difficult for them to exit after the game. But his opinion was not based on any data, and appears to have been primarily speculation. He did not claim expertise as a traffic engineer, and we find no other testimony in the record on the subject.

*The Facts*

At the first meeting between Anaheim and ASA in March or April of 1978, Anaheim informed ASA that the Rams would be a second tenant, subject to GWBC's prior leasehold. Anaheim gave ASA's attorney a copy of the 1964 lease so ASA could understand GWBC's rights. ASA obviously knew or had notice of the plans and specifications for the existing stadium and parking facilities, and that the parking facilities were an open-air, paved and marked parking lot. It also learned GWBC had been assessed a possessory interest tax under the 1964 lease.

During the negotiations, Anaheim was advised to obtain GWBC's approval before entering into any agreement to develop any part of the parking facilities. Anaheim was warned that leasing 95 acres to ASA for the development would violate the 1964 agreement. Anaheim Assistant City Attorney Frank Lowry criticized an early draft of the letter of intent in April because it did not guarantee GWBC's 12,000 parking spaces. City Manager William Talley wrote a letter in May pointing out the need to respect the present leases. The letter of intent was revised by July 25 to reflect GWBC's rights.

ASA proposed the Kenyon Plan, which contemplated developing 95 acres surrounding the stadium under a ground lease. On July 25 Anaheim and ASA signed a letter of intent embodying the plan's major terms, proposing a 27,000-seat expansion of the stadium and other changes to the property. Recognizing Anaheim's obligation to provide GWBC with at least 12,000 parking spaces, the letter of intent stipulated any parking spaces developed by ASA would be in addition to that number.

Rosenbloom held a press conference that day announcing his intention to move the Rams to Anaheim. GWBC representatives attended and were shown a three-dimensional model of the Kenyon Plan and copies of the letter of intent. The proposed development plan was still in the conceptual stage. It contained general statements about the development, but provided no specifics. Kenyon reviewed the plan with GWBC's Emil "Buzzie" Bavasi. He purportedly told Bavasi the 12,000 ground-level parking spaces would be replaced by parking structures. When asked what he thought, Bavasi said, "We endorse the whole concept."[35]

Anaheim sought GWBC's input concerning previous development projects in the parking lot. It did not seek formal approval of the ASA plan,

---

[35]Although ASA project manager Kenyon testified he reviewed the plans with GWBC's Bavasi at the press conference, and Bavasi "endorsed the whole concept," Kenyon claimed during his prior deposition that he had no recollection of anything Bavasi said at the press conference. We assume the trial court gave little credence to Kenyon's testimony about Bavasi's acquiescence to the parking structure. Similarly, we assume the court did not give great weight to testimony that by at least July 1978 GWBC had concluded the proposed

however, and contended at trial that GWBC had consistently conceded it had no right to veto development on the parking areas. Instead, Anaheim only sought GWBC's general support. GWBC did not object; it openly encouraged Anaheim and ASA to proceed. However, from the day of the press conference until the lease was signed, none of the parties knew the specifics of any parking facilities changes.

Before ASA and Anaheim signed contracts pursuant to the letter of intent, Rosenbloom met with Bavasi on November 1, 1978. Bavasi said GWBC would have "no problem" with ASA concerning the development and GWBC would cooperate. He told Autry of this representation. On November 21 Anaheim and ASA entered into the ground lease. It acknowledged that portions of the leased land were encumbered by the 1964 agreement and GWBC's parking rights, and the ground lease was subject to them.

Before the Anaheim City Council held its public hearing on November 21 to approve ASA's ground lease, Patterson and Bavasi met and agreed Patterson would decide whether to object to the ground lease or support it after he heard it discussed at the hearing. They concluded the council meeting was not a good time to make any official objection known. Patterson was present at the council meeting when the agreement was approved. He praised the events of the day and made no objections.

On January 10, 1979, GWBC's counsel, Claire Stout, wrote to Anaheim's stadium director Tom Liegler, concerning the elimination of some of the Angels' season ticket holders' seats. He emphasized that GWBC expected Anaheim to adhere to the provision of the 1964 lease which barred any reduction or diminution of the stadium and parking facilities, and that Anaheim could not assume GWBC's acquiescence in a breach of the lease merely by a failure to object. During that year, Liegler showed GWBC representatives various development concepts. GWBC consistently expressed concern about the traffic flow, traffic control, safety and access provided in each proposal. On one occasion, a GWBC representative told Liegler GWBC was generally opposed to the idea of commercial development on the parking lot. Liegler conveyed these concerns to ASA.

During negotiations for stadium expansion upon the Rams' arrival, GWBC demanded compensation if the number of parking spaces was reduced below 12,000. Bavasi told Talley that if Anaheim "gave us ground level spaces nearby in the same location, same approximate distance from

---

development constituted a breach of the 1964 agreement, and the GWBC executives spoke among themselves about the problem, even though they publicly welcomed the Rams to Anaheim Stadium.

the stadium, [GWBC] would be satisfied." Anaheim responded GWBC was entitled to only 12,000 spaces, which Anaheim could provide with any "suitable parking facilities it chose."

Bavasi argued Anaheim should make economic concessions to GWBC to compensate for the loss of parking spaces. Anaheim contended GWBC would be benefited rather than injured by commercial development. During these discussions Bavasi and Patterson told Lowry on several occasions they believed ASA's proposed development conflicted with GWBC's rights under the 1964 lease, while Anaheim City Manager Talley took the position GWBC had no rights in the parking area.

In October 1980, while Anaheim and GWBC negotiated changes in the 1964 lease, ASA project manager Theodore Tomasovich showed Patterson and Bavasi drawings of ASA's current development plan. It provided for 2,800,000 square feet of office, hotel and roadside commercial building on approximately 90 acres to be leased to ASA. The plan reduced ground-level parking to 8,000 spaces with the remainder in bi-level structures. Although there was some testimony to the contrary, Bavasi indicated he was totally opposed to the project, and Patterson said he never approved development on the parking lot.[36] Liegler told ASA that GWBC had "a major objection to the entire program."

In about December 1980, ASA discarded the Tomasovich plan and pursued the Wasson plan. In April 1981, Assistant City Attorney White told ASA about the parking dispute provision in paragraph 12B of the amended agreement between GWBC and Anaheim. White conveyed GWBC's belief that it had approval rights over any modification to the existing parking facility.

When ASA received a copy of the amended agreement, the Orangewood portion of the Wasson plan showed ground-level parking spaces for more than 12,000 vehicles and added parking on the Wagner-Michel parcel to increase the total number of ground-level spaces to 14,465. During the two years Wasson worked on the plan, he never contacted GWBC, having been told Anaheim would decide when to do so.

Eventually, Assistant City Attorney White told GWBC representatives about the ground lease for development of the parking lot, which was then being amended. They asked to see the plans, but were told none existed. Although the Orangewood Block Development Plan was substantially completed at that time, at Anaheim's direction, it was not shown to GWBC until

---

[36]The contrary testimony indicated Bavasi praised the plan, stating that "it looks fine, it's good for the City, it's good for us."

September 1982. GWBC was unaware of the precise changes to the parking facilities until that disclosure. It immediately objected. Within a few days, Liegler told ASA that Bavasi had a major concern about the development.[37] On October 26, 1982, Anaheim and ASA amended their lease by extending the time to complete the development and reducing the acreage from 95 to 68.

In late 1982, Autry became more involved in GWBC's operations. He was upset when he first learned of the proposed commercial development and Bavasi's promised cooperation. Although Bavasi continued to indicate GWBC had no problem with the development, Patterson objected to any changes in the parking facilities at a planning commission meeting on January 24, 1983.

On January 27, Bavasi and Patterson attended two meetings. At the first, with ASA representatives present, they expressed no objection to the Wasson plan, other than their concern that 12,000 ground-level parking spaces remain. In the second, with Anaheim officials in ASA's absence, Bavasi said GWBC would have no objection as long as the number of parking spaces was not decreased. However, he added Autry felt he was being treated as a second class citizen because the Rams were getting a better deal.

GWBC was not provided with plans and specifications for the Orangewood Block Development Plan until January 31, two weeks after the Anaheim Planning Commission approved a conditional use permit for the ASA development. At its meeting on February 8, the city council approved the ASA conditional use permit for the Orangewood Block Development Plan despite Patterson's objections that it was unfair to GWBC.

After the plan was approved the parties met on several occasions from February to May, pursuant to the 1981 amended lease's good faith requirement. Eventually, an impasse was reached, and GWBC filed suit on August 8, 1983.

### The Trial Court's Findings

The trial court found Anaheim and ASA knew or had notice of the 1964 lease's "advance written consent" provision and of the parking facilities as

---

[37]There was other testimony: After Bavasi reviewed a detailed slide presentation of the plan, he said, "Thank you very much. You guys have done a great job. I welcome you as neighbors." In 1982 and 1983, Bavasi acted consistently with GWBC's 1981 position, conceding GWBC had endorsed and agreed to the ASA commercial development and asking only for economic concessions for changes in entrances and exits set forth on the Wasson plan. He indicated GWBC's concerns were "mainly financial" and that it had no objections "as long as the number of parking spaces [would] not be decreased." We assume the trial court gave little or no weight to this testimony.

constructed. Anaheim's city attorney had warned Anaheim that the ASA proposal appeared to violate GWBC's lease. The trial court detailed GWBC's dealings with Anaheim and ASA concerning the proposed ASA development. Although GWBC's representatives verbally endorsed the development concepts on occasion, they never gave written consent and consistently voiced concerns or objections regarding any plans which might reduce the number of parking spaces or the stadium site's entrances or exits. Anaheim did not submit the proposed ASA development to GWBC before entering into the ASA agreement, as it had with other proposed developments in the past. No details or specifics on the actual development plans were given at the July 25, 1978, press conference, and GWBC had no specific facts to determine whether the development would affect its rights to the parking area.

Neither Anaheim nor ASA relied on GWBC's statements or conduct in entering into the agreement, including GWBC's statements of general approval of the project. In any event, the statements could not be reasonably relied upon to show acquiescence, nor did they show GWBC intended to mislead anyone. When Bavasi expressed general agreement with the projects from 1979 through 1981, GWBC and Anaheim were involved in negotiations for the amended agreement which set forth their dispute about GWBC's rights to the parking area. ASA was provided with a copy of the parking dispute provision in the amended agreement in early 1981. GWBC was not given plans and specifications under paragraph 12B of the 1981 lease until January 31, 1983, two weeks after the Anaheim Planning Commission issued a conditional use permit and one week before the matter came before the city council. Based upon these facts, the trial court also found Anaheim and ASA had not established the defenses of estoppel and unclean hands.

### The Applicable Law

The defense of equitable estóppel is established by showing: "(1) the party to be estopped [knew] the facts; (2) [the party intended] that his conduct [would] be acted upon; (3) the other party [was] ignorant of the true facts; and (4) [the other party relied] upon the conduct to his injury. (*City of Long Beach* v. *Mansell* (1970) 3 Cal.3d 462 [91 Cal.Rptr. 23, 476 P.2d 423].) . . . Where one of the elements is missing there can be no estoppel (*Strong* v. *County of Santa Cruz* (1975) 15 Cal.3d 720 [125 Cal.Rptr. 896, 543 P.2d 264]; *Johnson* v. *Johnson* (1960) 179 Cal.App.2d 326 [3 Cal.Rptr. 575])." (*Hersch* v. *Citizens Savings & Loan Assn.* (1983) 146 Cal.App.3d 1002, 1010 [194 Cal.Rptr. 628].)

ASA correctly points out it was not required to show an intentional misrepresentation. (*City of Long Beach* v. *Mansell* (1970) 3 Cal.3d

462, 491 [91 Cal.Rptr. 23, 476 P.2d 423].)[38] But ASA and Anaheim failed in their showing in two other respects. First, GWBC was unaware of Anaheim's and ASA's precise development plans until late 1982. The plans at the 1978 press conference did not show parking details, and the Tomasovich plans in October 1980 did not show multilevel parking.[39] Although Anaheim and ASA presented evidence to the contrary, the trial court resolved the issue adversely to them.

Second, to the extent Anaheim and ASA relied on GWBC's statements of general support for the development, their reliance was unreasonable.[40] (See *Russ Bldg. Partnership* v. *City and County of San Francisco* (1988) 44 Cal.3d 839, 853-854 [244 Cal.Rptr. 682, 750 P.2d 324] [reliance must be reasonable].) Both were aware of the terms of the 1964 agreement from the outset, since Anaheim provided ASA with a copy. The agreement expressly provided the minimum number of parking spaces could not be reduced or diminished without GWBC's written consent. GWBC's attorney Stout warned Anaheim in January 1979 not to assume any acquiescence to a breach of the lease, and the parking dispute was revealed in full flower in the 1981 lease negotiations. Given these facts, no reasonably sophisticated business person would rely upon oral pronouncements of general support in lieu of written permission.[41]

And, although ASA may not have had direct knowledge of these facts before 1981, GWBC was under no obligation to directly inform them. GWBC had no business relationship with ASA and, given its knowledge of Anaheim's negotiations with ASA, GWBC could reasonably assume Anaheim would inform ASA of GWBC's communications on the topic.[42] The same factors mandate the conclusion GWBC did not act in bad faith, which is a requisite to finding unclean hands. (See *Bennett* v. *Lew* (1984) 151 Cal.App.3d 1177, 1186-1187 [199 Cal.Rptr. 241].)

[38]Nonetheless, substantial evidence would support a finding GWBC did not intentionally seek to mislead Anaheim or ASA.

[39]Although knowledge may sometimes be imputed to a party (*City of Long Beach* v. *Mansell, supra,* 3 Cal.3d at p. 491), nothing about the circumstances merits doing so here.

[40]The trial court found ASA and Anaheim did not rely on any GWBC representations before they entered into their 1978 lease agreement. ASA attacks the import of that finding by arguing that it did not "invest [] millions in development costs" until after after GWBC made representations. Because we find any reliance was unreasonable, we need not consider this rather tenuous assertion.

[41]These circumstances distinguish cases relied upon by Anaheim. (See, e.g., *Altman* v. *McCollum* (1951) 107 Cal.App.2d Supp. 847, 862-863 [236 P.2d 914].) Because we find any reliance was unreasonable, the error, if any, in refusing to admit evidence of actual reliance was harmless. In reaching our conclusion regarding unreasonable reliance, we have not considered the April 17, 1978, confidential memorandum which the trail court excluded.

[42]ASA's contention GWBC should be estopped from claiming the 1964 agreement was a lease because it took a contrary position during the condemnation and possessory tax proceedings is moot in light of our finding the agreement was not a lease. GWBC never

## III

ASA contends the trial court erred in ordering specific performance of the agreement. Although this is the type of contract for which specific performance might be ordered, there was no breach on which to predicate it here.

 GWBC contends it established the requisites for specific performance enunciated in *Tamarind Lithography Workshop, Inc.* v. *Sanders* (1983) 143 Cal.App.3d 571, 575 [193 Cal.Rptr. 409]. But it fails to recognize specific performance is a *remedy* for breach of contract, a cause of action which requires proof the contract was breached. (5 Witkin, Cal. Procedure (3d ed. 1985) Pleading, §§ 732-733, pp. 180-181.)

Under the 1964 agreement, Anaheim's obligation was to provide a minimum of 12,000 ground-level parking spaces. It met that obligation when the parking lot was formed and the number of spaces never fell below the required minimum. The trial court found Anaheim breached paragraph 12-B of the 1981 agreement by issuing a *conditional use permit*. But the paragraph provided the parties would negotiate in good faith in an attempt to resolve the parking dispute before a *building permit* issued.

Trial testimony established that a conditional use permit is approved by the planning commission and city council, and "relates to a determination as to whether the proposed use of land is compatible with the surrounding uses . . . ." It differs significantly from and is a precursor to a building permit, which is issued by the building department following a review of the structural plans for compliance with the building code.

According to the record, a building permit was never issued, and the trial court found the parties negotiated in good faith on numerous occasions to resolve the dispute. In the absence of any breach, the trial court erred by granting specific performance.[43]

For the same reason, the trial court erred in granting injunctive relief. An injunction to enforce the terms of a contract may only be issued if the

asserted during those proceedings that it was not entitled to 12,000 gound-level parking spaces.

[43]Indeed, we have been unable to find a case where the trial court ordered specific performance in the absence of a breach or anticipatory breach. GWBC neither pleaded nor proved an anticipatory breach. That theory requires an express repudiation of the entire contract or an implied repudiation by voluntarily rendering performance impossible. (*Taylor* v. *Johnson* (1975) 15 Cal.3d 130, 137-139 [123 Cal.Rptr. 641, 539 P.2d 425].) At most there was a good faith dispute on some of the contract terms, a far cry from repudiation.

contract is specifically enforceable. (Civ. Code, § 3423, subd. (e); Code Civ. Proc., § 526, subd. (b)(5).)

IV

ASA argues a quiet title action could not lie because GWBC has "neither legal nor equitable title" to any of the stadium property. It misses the mark. A quiet title action may be brought where the plaintiff alleges less than a fee interest in the estate, such as a leasehold. (*Dieterich Internat. Truck Sales, Inc.* v. *J. S. & J. Services, Inc.* (1992) 3 Cal.App.4th 1601, 1603-1604 [5 Cal.Rptr.2d 388] [quiet title to an easement for access]; *Kennecott Corp.* v. *Union Oil Co.* (1987) 196 Cal.App.3d 1179, 1182-1183 [242 Cal.Rptr. 403] [quiet title to lease]; *Twain Harte Homeowners Assn.* v. *Patterson* (1987) 193 Cal.App.3d 184, 188-189 [239 Cal.Rptr. 316] [quiet title to easement]; see also *German-Amer. Savings Bank* v. *Gollmer* (1909) 155 Cal. 683, 686 [102 P. 932] [title may be quieted to leasehold]; 5 Witkin, *supra*, Pleading, § 605, p. 63 [quiet title available to quiet any interest in real property]; but see Code Civ. Proc., § 761.020, subd. (b) [complaint shall allege plaintiff's "title"].) The court may give judgment in the plaintiff's favor for whatever interest the plaintiff establishes. (Code Civ. Proc., § 764.010; 5 Witkin, *supra*, Pleading, § 618, p. 74 [judgment shall be rendered in accordance with the evidence and law].) The judgment here should quiet title in Anaheim's favor subject to GWBC's right to use the property.

V

GWBC claims the trial court erroneously denied a jury trial on its cause of action for intentional interference with contractual relations. (17) A jury trial is guaranteed for legal, as opposed to equitable, issues (Cal. Const., art. I, § 16; *Escamilla* v. *California Ins. Guarantee Assn.* (1983) 150 Cal.App.3d 53, 57 [197 Cal.Rptr. 463]), and wrongful denial of the right is reversible per se (*Heim* v. *Houston* (1976) 60 Cal.App.3d 770, 774 [131 Cal.Rptr. 755]). Where a case involves both equitable and legal causes of action, the trial court may bifurcate the case to try the equitable issues first, because resolution of the equitable issues may eliminate the need for a trial of the legal causes of action. (*Raedeke* v. *Gibraltar Sav. & Loan Assn.* (1974) 10 Cal.3d 665, 671 [111 Cal.Rptr. 693, 517 P.2d 1157]; *Strauss* v. *Summerhays* (1984) 157 Cal.App.3d 806, 813 [204 Cal.Rptr. 227].)

"The elements which a plaintiff must plead to state the cause of action for intentional interference with contractual relations are (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of

this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage. [Citations.]" (*Pacific Gas & Electric Co.* v. *Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1126 [270 Cal.Rptr. 1, 791 P.2d 587].) To state a claim for disruption of a contractual relation, the plaintiff need not show the defendant induced an actual or inevitable breach of the contract. It is sufficient to show the defendant's conduct made the plaintiff's performance, and inferentially enjoyment, under the contract more burdensome or costly. (*Id.* at p. 1129.) But in *Pacific Gas & Electric*, the Supreme Court held the plaintiff must show the defendant did more than induce the contract's other party to bring litigation on a potentially meritorious, or colorable, claim. (*Id.* at pp. 1130, 1137.)

 The situation here is analogous. There was no breach of the contract. At most, ASA's conduct prompted GWBC to file its lawsuit to determine its rights under the 1964 and 1981 agreements with Anaheim. Because GWBC rather than Anaheim instigated the litigation, the converse of the situation in *Pacific Gas & Electric Co.* v. *Bear Stearns & Co., supra,* 50 Cal.3d 1118, the apt question is whether GWBC's position was indisputably correct. Given the ambiguity in the contract terms, it was not. Although Anaheim wrongly concluded it could place 12,000 spaces anywhere on the property, including in parking structures, that construction was arguable because the contract did not expressly require ground-level spaces. And, GWBC's position, which prompted the litigation, that Anaheim could not build anywhere on the "leased" premises was at least as far off the mark. A business relationship with a party to a contract, which merely brings to a head the contracting parties' good faith dispute about the contract's construction, is not tortious.[44]

### Disposition

The judgment is ordered modified in the following respects: (1) judgment on the specific performance and injunction causes of action should be in favor of the defendants; (2) judgment on the cause of action for declaratory relief should delete references to a lease, reflect that the 1964 and 1981 agreements allow GWBC use of the stadium and surrounding property on game days with a minimum of 12,000 ground-level parking spaces provided on the stadium premises together with adequate ingress and egress, and state the Orangewood portion of the Wasson plan may be developed without

---

[44]This is so without regard to whether the party fomenting the dispute does so intentionally, as in *Pacific Gas & Electric Co.* v. *Bear Stearns & Co., supra,* 50 Cal.3d 1118. But we note there was no substantial evidence that ASA acted with such intent.

infringing on GWBC's parking rights but the State College Boulevard portion may not; (3) the description of the premises should be amended to add the legal description of the Orangewood exclusion, the Wagner-Michel property, and the state exclusions; and (4) judgment on the quiet title cause of action should quiet title in favor of Anaheim, subject to GWBC's right to use the property. As modified, the judgment is affirmed.

Sills, P. J., and Rylaarsdam, J.,* concurred.

A petition for a rehearing was denied June 21, 1994, and the petitions of all appellants for review by the Supreme Court were denied September 8, 1994. Mosk, J., was of the opinion that the petitions should be granted.

---

*Judge of the Orange Superior Court sitting under assignment by the Chairperson of the Judicial Council.

APPENDIX "A"

# Anaheim Stadium Parking
## Appendix "A"

## LEGEND

**Base Map**
**\*Red Line - "Plot Plan"**
**\*Demised Premises**

\*Reporter's Note: Due to publication constraints, colors
cannot be reproduced here. Accordingly,
the "Red Line" is represented by a bold
black line, and "Demised Premises" by
a dotted line.