# Staunton

ATLANTIC RURAL EXPOSITION, INC. v. THOMAS HENRY
FAGAN, ET AL.
ROYALL SPEEDWAY, INCORPORATED v. THOMAS HENRY
FAGAN, ET AL.

September 10, 1953.

Record Nos. 4084, 4085.

Present, Eggleston, Spratley, Buchanan, Miller and Smith, JJ.

The opinion states the case.

*John G. May, Jr.* and *G. Kenneth Miller*, for Atlantic Rural Exposition, Inc., plaintiff in error.

*Parrish, Butcher & Parrish* and *Richard L. Williams*, for Royall Speedway, Incorporated, plaintiff in error.

*J. Calvitt Clarke, Jr., M. Wallace Moncure, Jr., Parrish, Butcher & Parrish* and *Travis W. Poole*, for Thomas Henry Fagan, et al., defendants in error.

*J. Calvitt Clarke, Jr., M. Wallace Moncure, Jr., John G. May, Jr.,* and *Travis W. Poole,* for Thomas Henry Fagan, et al., defendants in error.

MILLER, J., delivered the opinion of the court.

Atlantic Rural Exposition, Inc., is the owner of a tract of land and facilities in Henrico County, called the Rural Exposition Grounds. A half mile oval track is maintained on part of these premises on which motor vehicle races are held at times. On September 30, 1950, Thomas Henry Fagan (hereinafter called plaintiff), a spectator at a stock car race, was seriously injured when a wheel became detached from a racing car, left the track, bounded into the bleachers and struck him a severe blow.

Plaintiff instituted action against five defendants; *i. e.,* Atlantic Rural Exposition, Inc. (hereinafter called Atlantic), Royall Speedway, Inc. (hereinafter called Royall), J. C. Dymacek, W. C. Luck and Edward F. Crouse. He alleged that all of them had been guilty of negligence that proximately caused his injuries. The case was tried before a jury, and at the conclusion of all the testimony, the court overruled motions of the corporate defendants to strike the evidence but sustained like motions of the individual defendants. Upon submission of the case to the jury, verdict for $15,000 was returned against both corporations, and judgment entered accordingly. We granted each defendant a writ of error.

There are numerous assignments of error, but they can be consolidated and stated as follows:

Each defendant asserts that:

(1) It breached no duty that it owed to plaintiff and was guilty of no negligence that caused his injuries and the court should have struck the evidence or set aside the verdict.

(2) The court should not have exonerated the three individual defendants unless it also exonerated the respective corporate defendants.

(3) The court should have submitted to the jury the issue of whether or not plaintiff assumed the risk of being injured by a detached wheel when he attended the races.

(4) The court erred in certain instructions that were given and refused.

These assignments of error require a full statement of the evidence bearing upon the relation of the several defendants to each other and to the plaintiff, the condition of the race track and the premises before and at the time of the mishap, and what happened when the accident occurred.

During the fall in what is called State Fair Week persons who desire to attend the Fair held at the Rural Exposition Grounds are required to pay an admission charge to enter the grounds, view the exhibits and join in the festivities. To gain admittance to the race track an additional charge is made. Within the race course area and adjacent to the south side of the track is located the grandstand, flanked at each end by bleacher stands, all of which accommodate spectators. Erected on the immediate edge of the track is a metal hub or guard rail eighteen inches high anchored to sturdy wood posts. Its purpose is to keep racing cars on the track. A yard behind this rail, extending parallel with the course, there is a woven wire fence 42 inches high, anchored to 1¾ inch pipes. The bleachers are approximately 80 feet from this fence and the grandstand somewhat farther. Along part of the stretch about midway between the stands and the wire fence, there was a light slatted barricade commonly called a snow fence. Its purpose was said to be to guide people to the seating facilities and keep them in the area adjacent to the grandstand and bleachers. But at the western end of this snow fence and in front of where plaintiff sat, a single chain swung an appropriate height from the ground was used for that purpose.

Royall is engaged in the promotion of motor vehicle races, and by written agreement of August 8, 1950, it leased Atlantic's track and race course facilities from August 10,

1950, to November 1, 1950. Atlantic agreed "to put the track in normal condition," and Royall was required to "apply Calcium Chloride, or other preparation," to keep it safe and free of dust. The consideration paid to Atlantic was 12½ per cent of the gross receipts collected by Royall from ticket sales to the races. Atlantic also retained exclusive privilege to sell soft drinks, beer, sandwiches, etc., on the leased area.

Under the contract Royall promoted racing events on specified days, and was authorized to hold races on "other days to be mutually agreed upon between the parties." Two of the days specified for holding races were September 30, 1950, and October 7, 1950. On these days, Royall's rights to the facilities were somewhat more restricted than those it enjoyed on Labor Day or on any other agreed dates. On the two specified dates Atlantic furnished the ticket sellers, gatemen and guards, and it reserved the right to retain all fees charged patrons for automobile parking within its grounds, but was required to furnish police protection inside and outside the leased area. On all other days that races were held, Royall furnished the necessary personnel but enjoyed the right to collect and retain all funds received for parking privileges and was required to provide police protection.

The contract also provided that Atlantic should "not be personally or in any other way responsible in staging" the events, such staging being Royall's "sole responsibility." Thus the obligation to obtain drivers and cars was upon Royall, and it contracted with Richmond Stock Car Racing Association, hereinafter designated Association, to put on races on September 30, 1950. Under that agreement Association received a percentage of the gate receipts collected by Royall, and Association, in turn, secured the drivers, to whom it offered prizes as an inducement to participate in the races. No control was exercised over Association or its drivers by Royall, and the drivers who were members of Association were at liberty to withdraw from any race.

On September 30 plaintiff attended the fair, and after

paying all charges required to enter the race course area, he took a seat in the west bleachers. It does not appear in what row he was seated, but the testimony shows that he was "about a third of the way up, approximately 20 feet," from the first row.

The evidence discloses that the track had been put in excellent condition by Atlantic, and on the morning of September 30, it was treated by Royall with calcium chloride, which makes the dirt more cohesive. The races were run in a counter-clockwise direction, and as they progressed, there was a tendency at places along the course for the dirt to dig out or crack, rendering the track "a little choppy." That condition had developed on the turns but was to be expected, for a certain amount of roughness, especially on the turns, is inevitable on dirt tracks after races have progressed thereon for some time. There was nothing about this track that was unusual or caused any of the drivers to become apprehensive of their safety and the feature event was held after the mishap in which plaintiff was injured without anything further being done to the course.

Some qualifying "heats" or races of ten laps each, a consolation race for drivers who did not qualify, and a feature event to be participated in by those who qualified in the "heats" were held. Defendant Crouse entered the races as driver of a car owned by defendants Dymacek and Luck, and he drove in the second "heat" and in the consolation race. After he had completed several laps in the latter race, the right front spindle of his car broke. This occurred just as he completed the turn slightly to the left and northwest of the stands and entered the straight-away in front of the bleachers.

The driver brought the car to a stop but the freed right front wheel continued skidding on its side along the track. When it reached the outer edge and struck the metal guard rail, it turned upright and bounded approximately five feet into the air and over the 3½-foot woven wire fence. After

striking the ground, it passed under the suspended chain and bounded into the bleachers and struck the plaintiff.

Before the automobile driven by Crouse entered upon the races, it was inspected and no defect found. However, after the mishap the hub and wheel were x-rayed and examined. No defect or flaw was found in them, but there was definite evidence of a fatigue failure in the spindle. That is described as a failure in metal brought on by continuous stress and strain applied over a period of time. The danger of spindles breaking on racing cars from fatigue failure is enhanced by a bumpy or rough track, and it is not an infrequent occurrence. It is difficult to guard against and is a recognized hazard of racing.

However, there is no proof that the existing or approaching fatigue failure on the spindle of this car should or could have been discovered before the mishap.

The individual defendants enjoyed no proprietary interests or rights in the leased premises. The car that they used had been subjected to reasonable inspection and was believed to be safe. They were not responsible for the maintenance of the track or the fences around the course, nor were they to share in the funds derived from the spectators. We find no breach of duty or negligence on their part, and no error was committed by striking the evidence and exonerating them from liability.

The area occupied by the spectators was under the control of one or both of the corporate defendants. Thus we now consider their relation to each other and to the plaintiff, and the condition of the premises and the facilities provided by them for the safety of the invitees.

Atlantic's track and premises were inspected and approved by the American Automobile Association for races that the latter had sponsored at times. Without objection, evidence was offered by plaintiff and defendants that compared this track and premises with other courses. Testimony concerning the fences, barriers and location of the stands at Atlantic's grounds indicated that they compared favorably with those at some other tracks. The 3½-foot

protective wire fence, was, however, not as high as that usually found at courses of this character, but it was better than found at some. And it was shown that at some tracks the spectator stands are closer to the speedway than they are on Atlantic's.

N. W. Royall, president of one defendant corporation, operates a race course some miles distant from the exposition grounds. He testified that the protective wire fence at his track was 8 feet high and well anchored, with the spectator stands 8 or 10 feet from the track. When questioned as to why he erected an 8-foot fence, and what was the relative hazard of a fence of lesser height as compared with the 8-foot fence, he testified as follows:

"Q. Mr. Royall, in your experience of racing and watching and operating a Speedway you used the knowledge you acquired in building your own Royall Speedway out at Midlothian, didn't you, to make it safe for people and constructed it so you thought it would protect them?

"A. Yes, sir.

"Q. And that is the reason you put the 8-foot fence because you didn't deem a 42-inch fence high enough to protect people from these spindles breaking?

"A. I put it there for safety.

"Q. And that is one of the main accidents, the flying wheels, that endangers spectators, isn't it?

"A. Well, that is one of the things—

"Q. That happens.

"A. That is one of the hazards to racing.

\* \* \* \* \* \* \*

"Q. \* \* \* You certainly did not see any 8-foot fence like you have got at Royall Speedway, did you?

"A. No, sir.

"Q. You knew that increased your hazard some, didn't you?

"A. Well, it would be bound to increase the hazard, but I didn't think of it."

He also said that a freed wheel had jumped the 8-foot

fence maintained at his track. When questioned about the 18-inch hub rail and asked whether or not if this rail were struck by a free wheel, it might not tend to help the wheel clear the 3½-foot fence, he answered thus:

"Q. Mr. Royall, with respect to this guard rail you described as being about 18 or 20 inches high, you did see the wheel as it came down the track, hit that, didn't you, and then ricochet over the fence?

"A. I saw it just before it got to the hub rail.

"Q. Now the hub rail is almost like one step up on the 42-inch fence, isn't it? It is slanted, sloped?

"A. I would say yes. I have stepped on it myself.

"Q. And a wheel hitting it loose will get on top of it, wouldn't it, in all probability?

"Mr. Parrish: Get on top of what?

"Mr. Moncure: The guard rail.

"Q. The wheel that is off an automobile, hitting that slanting guard rail, would naturally tend to mount the guard rail, wouldn't it?

"A. It would depend on just how it hit it. If it hit it from the side, it should throw it back, but hitting it as this wheel hit it, it would go over top of it.

"Q. In other words, after it got on top of the guard rail 20 inches high it didn't have but 22 more inches before wham it was over the 42-inch fence?

"A. Yes, sir."

Louis G. Shuman, a driver and racing expert who had personally experienced "quite a few" broken spindles, testified that when a right spindle breaks, the wheel is usually caught under the car. He said:

"Most of the time it folds right under and the car clinches it. * * * Most of the time when a left spindle breaks it takes off and there is no telling where it is going. * * * "

"Q. And you have seen spindles break and wheels go how high up in the air on your left wheels?

"A. I have seen them go—I don't know how high. I have seen them go way up in the air.

"Q. And you have seen them go over a 42-inch fence, haven't you?

"A. Yes, sir."

Testimony of James B. Dunn, another expert who was a driver on September 30, as to how far a freed wheel may travel was:

"Q. Haven't you seen them ricochet and run 200 or 300 yards and nothing stops them?

"A. Yes, sir."

These dominant facts and circumstances must be considered in the light most favorable to plaintiff and all just inferences that may be drawn therefrom resolved against defendants. When that is done, was it reasonably foreseeable that a wheel might become freed from a racing car and enter the area occupied by spectators; and if so, can either or both defendants be held responsible for the injuries inflicted upon plaintiff?

Atlantic asserts that as landlord it was not in possession of the premises when plaintiff was injured. It then insists that it could be held responsible only for an unsafe or dangerous condition existing in the leased premises and known to it or which by reasonable inspection might have been known at the time of the leasing. 52 C.J.S., Landlord and Tenant, sec. 422-b(2), p. 77; Restatement of Torts, sec. 359.

Royall contends that under the lease its sole duty was to keep the track safe and free from dust, and that the right of control and duty to see that the area occupied by spectators was safe was the obligation of lessor. It says that it had entered into an independent contract with Association to stage the races and was a bare lessee without control, and could be held responsible only "for open and obvious defects in the premises known to it and negligently suffered to exist." 52 C.J.S., Landlord and Tenant, secs. 434-435, p. 111; 84 University of Pennsylvania Law Review, 467, 477.

These contentions do not, however, state the defendants' full rights and duties. They fail to take into account the

object contemplated in the contract, the interests of defendants in the enterprise undertaken, and the fact that plaintiff was really the invitee of both. He was a patron of both lessor and lessee, and the instrument under which each acquired and enjoyed certain rights and privileges was something more than a bare lease. Under it Royall leased the area and was to stage an event to which the public was impliedly invited by both defendants, and each corporation benefited in proportion to the attendance and their liability to the public was equal and co-extensive.

That both defendants owed a duty to the public and would be liable to the spectators for an unsafe condition on the premises known by the lessor to exist at the time of the letting, or which could have been known upon reasonable inspection, and which the tenant knowingly allowed to continue, is not open to dispute. *Webel* v. *Yale University, et al.*, 125 Conn. 515, 7 A. (2d) 215; 84 University of Pennsylvania Law Review, *supra*; 32 Am. Jur., Landlord and Tenant, secs. 651 and 822; 52 C. J. S., Landlord and Tenant, sec. 434.

Plaintiff had attended the event on the implied, if not express, invitation of each defendant, and both of them were obligated to exercise reasonable care for his safety. *Richmond & Manchester Rwy. Co.* v. *Moore's Adm'r.*, 94 Va. 493, 27 S. E. 70; *Knight, etc.* v. *Moore, et al.*, 179 Va. 139, 18 S. E. (2d) 266; *Va. State Fair Ass'n.* v. *Burton, Adm'r.*, 182 Va. 365, 28 S. E. (2d) 716. To discharge this duty it was incumbent upon them to take reasonable precaution to guard against foreseeable dangers incident to the enterprise jointly undertaken.

" * * * If a person has knowledge, actual or implied, that unusual consequence may result from his negligent act, he can be held liable for an injurious consequence of such act, notwithstanding it is not the ordinary consequence of an act of that kind. Even remote negligence may be actionable where injurious consequences reasonably might have been foreseen by the wrongdoer. * * * " 38 Am. Jur., Negligence, sec. 58, p. 707. 25 Harv. L. R., 223, 238.

Both defendants assert that reasonable precaution was used in determining the character of barricades maintained and the distance that the stands were located from the track, and that it was not reasonably foreseeable that a wheel would become detached from a racing car and enter the area assigned to spectators. They also insist that no evidence was offered by plaintiff to show what character of fences or barricades should have been maintained or what distance the stands should have been located from the track and thus no standard of care has been established by which responsibility may be measured and fixed. They then argue that no lack of care can be inferred from the mere fact that a spindle broke and the wheel left the track, bounded over the 3½-foot fence and entered the stands.

Several cases involving injuries to spectators at car races under varying sets of facts are cited by defendants to show that plaintiff's injury was not a reasonably foreseeable consequence. Chief among them is the recent decision of *Blake, et al.* v. *Fried, et al.*, —— Pa. ——, 95 A. (2d) 360 (1953), in which plaintiff was denied recovery. Its recited facts are, however, clearly distinguishable from those disclosed in the case at bar. The grandstand at that course, in which plaintiff was seated, was six to ten feet from the track. The timber guard rail was three feet in height and the protective fence, one yard behind it was fourteen feet high and reinforced with three heavy cables. The wheel that struck the spectator became detached from a racing car, struck the guard rail, bounded twenty-four feet into the air and over the fence. From recited facts in that case it does not appear that any evidence was introduced to show that detached wheels were a recognized hazard of car racing or that they had even been known to hurdle a 14-foot fence. Thus there was no proof that defendants knew or should have known that there was any danger that the spectator might be injured by a detached wheel.

In the case before us it has been shown that the breaking of a spindle is not an unusual occurrence and that wheels thus freed have been known to hurdle fences 3½ feet

high or considerably higher and to travel a greater distance than this stand was from the track. Both defendants, as experienced race track owners and operators, knew or should have been aware of these dangers. The jury was thus justified in concluding that the hazard of a wheel bounding over this fence and into the spectators' area was within the realm of foreseeable dangers.

We find no merit in the contention that no expert evidence was offered to establish a standard of care to be followed in the erection of protective facilities. Testimony offered by all parties shows that different types of protective fences and barriers and location of stands at varying distances from the tracks obtain at different race courses. The question presented was not whether the protective facilities at this course compared favorably or unfavorably with the varying facilities at other courses. The issue was whether or not this rail and this fence, when considered in relation to the distance of the spectator area and bleachers from the track, constituted adequate protection from foreseeable dangers.

"It was not for the jury to compare places and determine which was the safer, but to determine whether the place furnished was reasonably safe." *Virginia Portland Cement Co.* v. *Seal*, 110 Va. 484, 486, 66 S. E. 75.

If no proof had been offered to show that freed wheels at times hurdle 3½-foot fences and travel considerable distances, and that such facts were known or should have been known to defendants, there would have been some merit in defendants' assertion that evidence to establish a standard of care was necessary. But here evidence was offered that distinctly tended to show that freed wheels are recognized hazards and that they at times hurdle fences as high or even higher than the one maintained and travel hundreds of feet. No expert testimony was necessary to show that this fence was known or should have been known to experienced race track operators to be insufficient protection for spectators within the area provided for them.

"Courts constantly have to refer to juries the question of what is reasonable conduct, or reasonable prudence, under all the circumstances of the case, with no other guide than their own judgment and conclusion as reasonable men." *Chesapeake & Ohio R. Co.* v. *Allen,* 137 Va. 516, 522, 120 S. E. 157; *Southern Stevedoring Corp.* v. *Harris,* 190 Va. 628, 58 S. E. (2d) 302.

In the brief of one defendant it is said, "If the fences and barriers were inadequate, it was an open and apparent defect readily recognizable to those of experience. * * * " With that statement we agree. Thus the jury's conclusion that this fence and the other facilities were inadequate was justified.

We cannot agree with the contention that plaintiff assumed the risk of being struck by a detached wheel when he attended the races and that such issue should have been submitted to the jury. The evidence discloses that he had attended four other stock car races but this was the first time that he had visited this race track. It was not shown that he was aware that the breaking of spindles was a recognized hazard at race tracks or that he had any experience or knowledge as to how far a freed wheel might travel or what barriers it might surmount. There was no proof that he was aware of the hazards of racing as were the defendants, and there was nothing to suggest to him that the bleachers were not safe for him to occupy. The court was correct when it refused to submit the proposed issue to the jury.

Instruction No. 1, given at the instance of plaintiff and set out below, is assailed by both defendants:

"The Court instructs the jury:

"That, if you believe from the evidence that Atlantic Rural Exposition, Incorporated, and Royall Speedway, Incorporated, put on Stock Car Races on the grounds of Atlantic Rural Exposition, Incorporated, and invited the public to attend such races, charging admission to its premises and that the track or premises where the public were seated were of such a nature as to render the premises

dangerous to those who might assemble there to view such races under all the circumstances, then the legal obligation rested on Atlantic Rural Exposition, Incorporated, and Royall Speedway, Incorporated, to exercise ordinary care to see that its premises were reasonably safe for all persons upon said premises, who had paid the admission charge to see said race.

"And if the Jury shall believe from all the evidence that plaintiff, Fagan, while viewing said races in a seat provided for him by the defendants, was injured in consequence of the neglect of the defendants, Atlantic Rural Exposition, Incorporated, and Royall Speedway, Incorporated, to exercise such care on said premises then they shall find for the plaintiff."

Defendants contend that there was "no evidence that the track or other portions of the premises were in a negligent condition * * * ," that the instruction failed to state "specific facts upon which a verdict" could be found and was so broad as to allow the jury to find for plaintiff for an unforeseeable injury.

The instruction should have been more carefully worded. There was no actionable negligence proved solely because of the condition of the track proper. Thus the disjunctive phrase, "and that the track or premises where the public were seated were of such a nature * * * ," should have been rephrased. The instruction should have clearly stated what was meant by "the track" and that no finding could be solely predicated upon the condition of the track proper.

Yet it was the duty of defendants to keep the area occupied by spectators reasonably safe when the track, in whatever condition it might be, was being used for the purpose contemplated. No objection specifically directed to the disjunctive language was made and the court in other instructions told the jury that there could be no recovery based solely upon the fact that the spindle broke, which is all that might have been attributed to the condition of the track. The instruction by fair interpretation finally limited liability to a breach of duty to maintain the premises

where the public "might assemble" in a reasonably safe condition. That, we think was sufficient to keep the jury from being misled and sufficient to preclude a finding based alone upon the condition of the track.

Nor do we find merit in the other objections to the instruction. The evidence offered by all parties was primarily directed to whether or not the track was safe and the fences and barricades were reasonably adequate to protect spectators from a freed wheel, and if an injury thus inflicted was within the realm of foreseeable danger. The conclusion of Instruction No. 1 limited a finding to proof that the spectator was injured solely because of defendants' failure to exercise ordinary care to see that the premises were reasonably safe. There was no conflict in the evidence as to what struck plaintiff, how or why the wheel became freed or how it entered the bleachers. By another instruction the court expressly told the jury that it was not negligence to fail to take precautionary measures to guard against an injury that "could not have reasonably been anticipated * * * ." When that instruction is read in connection with No. 1, the duty of the defendants in the premises and the neglect relied upon were made sufficiently plain and the realm of inquiry and the issues to be decided by the jury were not too broadly stated.

Defendants were represented by different counsel. Though each corporation in some measure relied upon the same fundamental defenses, their cases were separately presented and they contended that their duties and liabilities were by no means identical.

Several written instructions were offered by each that dealt only with the individual defendant's duties and liabilities. However, after all the written instructions had been read to the jury, the court of its own motion orally instructed as follows:

"Gentlemen of the jury, the Court further instructs the jury that if you find for the plaintiff you shall find against both defendants in this case; that is, Atlantic Rural Exposition, Inc., and Royall Speedway, Inc., and if you find for

one defendant you shall find for the other defendant—both defendants, rather. The Court has stricken the evidence as to Dymacek, Luck and Crouse."

Defendants excepted and say that even if the jury was correctly instructed as regards each defendant in the written instructions, yet the court committed error by giving the oral instruction. They insist that their obligations and liabilities were not identical, and there could be a finding against one and for the other, and that the oral instruction thus conflicts with written instructions that put their liability to the jury separately.

We have heretofore concluded that the proprietary rights and interests, and the duties and liabilities of the two defendants, to the spectators were co-extensive and the same. Thus the oral instruction was correct. If the court was in technical error by separately stating and setting forth each defendant's duties and liabilities in the written instructions, that error was not prejudicial to defendants, but rather in their favor. Had there been a finding for one defendant and against the other, difficulties would have been presented, but as the finding was against both, no prejudicial error has occurred.

Eighteen of the instructions offered by the defendants were given. In those instructions the jury was, among other things, told that plaintiff must prove negligence by a preponderance of evidence; defendants were not insurers but owed him only reasonable care; defendants could be held only for negligence, and their negligence had to be the proximate cause of the mishap; defendants were not responsible for an unavoidable accident; defendants were not liable if the mishap was solely caused by the breaking of the spindle; the meaning of the phrase "proximate cause"; and finally the jury was advised that there could be no finding against a defendant if it had "exercised reasonable care for the safety of persons attending the races * * * ," and that no verdict for plaintiff could be based on sympathy, surmise or conjecture.

It thus appears that the jury was comprehensively and adequately instructed upon all material issues presented by the facts and circumstances in evidence.

All objections and assignments of error to the rulings of the court on instructions, given or refused, have been considered. Some of the refused instructions were repetitious and others objectionable. We find no error in those given or in the rulings on those that were rejected. On the whole, it appears that the jury was correctly and fully instructed, and a fair and comprehensive trial accorded all litigants. We find no reversible error in the record, and the judgment is accordingly affirmed..

*Affirmed.*