**Joel W. SWENSON, Plaintiff, Appellant,**

v.

**SUNDAY RIVER SKIWAY CORPORATION, Defendant, Appellee.**

No. 95–2273.

United States Court of Appeals, First Circuit.

Heard March 8, 1996.

Decided March 19, 1996.

Graydon G. Stevens, with whom Kelly, Remmel & Zimmerman, Portland, ME, Gary D. McQuesten, and Valsangiacomo, DeTora & McQuesten, P.C., Barre, VT, were on briefs, for appellant.

Elizabeth J. Wyman, with whom Evan M. Hansen and Preti, Flaherty, Beliveau & Pachios, Portland, ME, were on brief, for appellee.

Before BOUDIN, Circuit Judge, CAMPBELL, Senior Circuit Judge, and LYNCH, Circuit Judge.

LYNCH, Circuit Judge.

Maine has chosen to exempt ski areas from liability for actions for injuries resulting from risks "inherent" in skiing. The statute, 26 M.R.S.A. § 488 (West 1988), does, however, permit actions for injuries actually caused by the negligent operation or maintenance of the ski area. The question presented is whether a skier who was injured when he fell negotiating moguls not visible from a "breakover"[1] just above suffered injury as a result of a risk inherent in skiing or from the negligent operation or maintenance of the ski area. We hold that this case involves the inherent risks of skiing, thus is within the immunity Maine has chosen to afford, and affirm the entry of summary judgment for the Sunday River Skiway Corporation.

A skier of more than 20 years experience, Joel W. Swenson skied down expert trails at Sunday River on March 24, 1993 before skiing the "3–D," an intermediate trail. He started down the upper portion of 3–D, traversing it at giant slalom (GS) speed. The trail had been groomed smooth that far. As he approached the crest of the breakover at the intersection of 3–D and the Last Mile Trail, Swenson slowed slightly. What was beyond the breakover was not visible. What was beyond the breakover were moguls across the entire width of the trail. Swenson, skiing too fast to negotiate the moguls, fell and was injured. There is no dispute that the moguls had formed on the trail naturally, as a result of normal skier traffic. There is also no dispute that Sunday River, had it so desired, could have groomed the entire length of the trail smooth. However, Sunday River, which had designed 3–D, as the name implies, to be a mogul trail, designedly decided to groom only the upper portion of 3–D and not to remove the mogul field from the bottom portion of the trail.

Because the appeal is from entry of summary judgment, our review is *de novo*. *Commonwealth of Mass. v. Blackstone Valley Elec. Co.*, 67 F.3d 981, 985 (1st Cir.1995). We regard the record and draw all inferences favorably to Swenson. *Id.*

The legislative policy behind the Maine Skiers' and Tramway Passengers' Responsibilities Act is expressed in the language of the statute in effect at the relevant time:

It is hereby recognized that skiing as a recreational sport and the use of passenger tramways associated therewith may be hazardous to skiers or passengers, regardless of all feasible safety measures which can be taken. Therefore, each skier shall have the sole responsibility for knowing the range of his own ability to negotiate any slope or ski trail, and it shall be the duty of each skier to conduct himself within the limits of his own ability, to maintain control of his speed and course at all times while skiing, to heed all posted warnings and to refrain from acting in a manner which may cause or contribute to the injury of himself or others. Except as otherwise specifically provided in this subchap-

---

1. "Moguls" are bumps in the snow surface of a ski trail. They are created by skiers carving out their turns. It is a common practice for ski areas to leave all or portions of a trail ungroomed so as to retain moguls. A "breakover" is the convergence and changeover of two or more trails of differing slope.

Our definitions are from the district court's opinion. We realize, however, that with changing times and vocabularies (especially in the increasingly technology oriented world of downhill skiing), the meaning of words such as "mogul" may change. For example, *The Real Skier's Dictionary* provides (humorously) the following "archaic" definition of the term "moguls": "bumps appearing on the slope *before the days of grooming machines*." Morten Lund, *The Real Skier's Dictionary* (1983) (emphasis added).

ter, each skier who participates in the sport of skiing shall be deemed to have assumed the risk of the dangers inherent in the sport and assumed the legal responsibility for any injury to his person or property arising out of his participation in the sport of skiing, unless the injury or death was actually caused by the negligent operation or maintenance of the ski area by the ski area operator, its agents or employees. Except as provided in this section, the responsibility for collisions by any skier while actually skiing, with any person or object, shall be solely that of the skier or skiers involved in [the] collision and not that of the ski area operator. This section shall not prevent the maintenance of an action against a ski area operator for the negligent design, construction, operation or maintenance of a tramway.

26 M.R.S.A. § 488 (West 1988).

Against this framework, Swenson makes two claims. He says that Sunday River negligently maintained and groomed 3–D in such a manner as to create a mogul field immediately below a breakover where it was not visible to skiers approaching it from above at expected and appropriate speeds. He also argues that Sunday River negligently failed to mark or warn of this hazard.

Recognizing that negligent design of a trail is immunized from liability under the statute [2] as interpreted by this court in *Finnern v. Sunday River Skiway Corp.*, 984 F.2d 530, 534 (1st Cir.1993), the parties have framed the issue as whether the presence of an ungroomed mogul field below a blind breakover gives rise to a design issue as opposed to an issue of operation or maintenance. To some extent, on particular facts, the answer to whether a feature of a ski trail is a design feature or one of operation and maintenance may be a matter of degree. But we think it sufficiently clear in this case that deciding to retain and not groom away moguls on a trail was a design decision that Swenson's claim is precluded as a matter of law.

Swenson argues that the term "design" should be restricted to those aspects of a trail which are immutable or permanent, such as degree of curvature or incline. He argues that there was nothing natural, inseparable or necessary about the moguls being just below the breakover and thus their presence there was not an inherent risk of skiing. While the sudden appearance of moguls on a trail might be natural, Swenson argues that these moguls resulted from Sunday River's decision not to groom and that this is a legally viable distinction. The very fact that some choice was made, he says, entitles him to get to a jury. We think that the argument misperceives the legislative intent. The trail on which he was injured was designed to be a mogul trail and the location of the moguls, even if shifting, cannot be separated from the design decision made by Sunday River. Moguls are inherently risky for skiers—that may be precisely why skiers are lured by mogul trails. Moguls are an inseparable characteristic of the 3–D trail and an inherent risk of skiing. *Cf. Knight v. Jewett,* 3 Cal.4th 296, 11 Cal.Rptr.2d 2, 14, 834 P.2d 696, 708 (Cal.1992) (in banc) (risk posed by moguls is an inseparable part of the sport); *O'Donoghue v. Bear Mountain Ski Resort,* 30 Cal.App.4th 188, 35 Cal.Rptr.2d 467, 469 (1994) (same).

Swenson's argument that Sunday River had a duty to warn of the existence of moguls below a breakover must be weighed in light of the statute's express admonition that "it [is] the duty of each skier to conduct himself within the limits of his own ability, to maintain control of his speed . . . at all times while skiing . . . and to refrain from acting in a manner which may cause or contribute to the injury of himself or others." 26 M.R.S.A. § 488 (West 1988). The convergence of two trails at a breakover with no forward visibility requires a skier to adjust his or her speed appropriately. While skiing at GS speeds on the upper, mogul-free portion of the trail, where there was clear visibility, may have been appropriate, it is undisputed that the speed at which Swenson skied below the breakover was inappropriate. There was, at the very least, a risk of another skier on the other side of the breakover, a risk this court described as "inherent" in *Finnern,* 984 F.2d

---

2. The statute expressly permits suits arising out of negligent design of a tramway but not of a ski trail. This suit does not involve a tramway accident.

at 537. If Swenson could be presumed by law to have assumed that risk, there seems no principled basis for saying that he could not be presumed to have assumed the risk that other unextraordinary unseen hazards in the nature of moguls might be present beyond the crest.

Swenson's own expert testified that Swenson's GS speed and style made it impossible for him to handle the mogul field he encountered and that even an expert skier could not have negotiated the mogul field at Swenson's GS speed. Swenson testified that had he been skiing slower, he could have handled the moguls. The breakover itself, combined with the lack of visibility, put Swenson on notice that there might be moguls (or other comparable hazards)—the presence of which clearly are inherent risks of skiing—just below. The breakover provided a natural warning of risks below that required Swenson to slow. The statute placed the responsibility of guarding against those risks on Swenson. Under the circumstances, there was no duty to warn.

*Affirmed.*