Present: All the Justices

PATRICIA STONE HOAR, AS
GUARDIAN OF THOMAS HOAR

OPINION BY
v. Record No. 972334    CHIEF JUSTICE HARRY L. CARRICO
November 6, 1998
GREAT EASTERN RESORT MANAGEMENT,
INC., t/a MASSANUTTEN SKI RESORT

FROM THE CIRCUIT COURT OF ALBEMARLE COUNTY
Joshua L. Robinson, Judge Designate

On January 19, 1992, Thomas Hoar (Thomas) suffered disabling brain damage in a skiing accident on a ski trail maintained at a ski area near Harrisonburg by Great Eastern Resort Management, Inc., t/a Massanutten Ski Resort (Massanutten). In a motion for judgment alleging negligence on the part of Massanutten, Thomas's wife and guardian, Patricia Stone Hoar (the Guardian), sought recovery of damages for Thomas's injuries. A jury returned a verdict in the Guardian's favor in the amount of $6,170,563.00. Upon motion of Massanutten, the trial court set the verdict aside and entered judgment in favor of Massanutten. We awarded the Guardian this appeal and granted Massanutten's assignments of cross-error.

At the outset, Massanutten raises a question concerning the standard we should apply in reviewing the judgment of the trial court. Massanutten argues that when a trial court sets aside a jury verdict, the verdict is not

entitled to the same weight as one that has been approved by the court.  Mann v. Hinton, 249 Va. 555, 556-57, 457 S.E.2d 22, 23 (1995).  Massanutten also asserts that the jury verdict in this case is entitled to little or no weight because it was in the exact amount of Thomas's special damages.  When such a verdict is returned, Massanutten says, "it bespeaks a compromise . . ., the integrity of the jury's finding on liability is suspect, and the . . . finding on liability is impeached."  Ford Motor Co. v. Bartholomew, 224 Va. 421, 433-34, 297 S.E.2d 675, 681-82 (1982).  Further, Massanutten maintains, the trial court was of opinion there was no evidence to support the verdict in any event.  Additionally, Massanutten says, neither party seeks a new trial.  "Under these circumstances," Massanutten concludes, "the standard of review should focus on whether there is evidence to support the trial court's action entering judgment for Massanutten rather than whether there is evidence to support the jury verdict."

However, it is the established rule that "[e]ven though the trial court [has] set the verdict aside, we [will] state the facts and reasonable inferences to be drawn therefrom in the light most favorable to the [party] who prevailed before the jury."  Stump v. Doe, 250 Va. 57,

58, 458 S.E.2d 279, 280 (1995).  See also Griffett v. Ryan, 247 Va. 465, 467, 443 S.E.2d 149, 150 (1994).  "[A]nd if there is any credible evidence in the record that supports the verdict, we must reinstate that verdict and enter judgment thereon."  Id.

Stated in the light most favorable to the Guardian, the evidence shows that on January 17, 1992, two days before Thomas's accident, Massanutten opened to the public a new, more advanced ski trail, known as "Diamond Jim."[1]  This trail was built in a heavily wooded area by a "cut and fill" process, which is used when a ski run does not follow the natural "fall line" of a hill or mountain.  According to an expert witness called by the Guardian, "[t]he fall line of a hill or a slope is the direction a ball would roll if you were to let it go and it rolled slowly [or] the direction water would flow if left to itself."

In the cut and fill process, the side of a hill or mountain is cut away to form one side of a ski run and the excavated soil is used to fill in the opposite side to make the run even and to double its width.  In the area of Diamond Jim where Thomas was injured, the cut and fill

---

[1] Ski trails are marked according to their relative difficulty at each ski resort.  Green circles indicate the trails that are the easiest, blue squares the more

process created a "drop-off," having a vertical drop of some thirty feet, on the left side of the downhill ski run.[2] The bottom of the drop-off contained rocks and logs. The drop-off also had a double fall line, meaning that the hypothetical ball "wouldn't go straight down the middle of [the ski] run [but] would taper off [to the bottom of the drop-off]." The cut and fill process also left a gap between the left edge of the ski run and the tree line, which bordered the remainder of the run on both sides, eliminating a "visual cue to the skier that this is the edge of the trail, don't go over here."[3]

The groomed area of the ski run had a snow depth of two feet. The snow surface was "very hard packed" and the ground was "extremely hard." A "berm" of snow, one foot higher than the groomed area, ran along the left edge of the run and the snow tapered off to a depth of only a few inches at the bottom of the drop-off.

---

difficult, and black diamonds the most difficult at the particular ski area.

[2] The drop-off was variously described by the Guardian's witnesses as "very steep," "a sheer drop-off," "a 30-foot cliff," and "a hidden drop-off." A Massanutten witness said the grade of the drop-off was "only slightly steeper" than the "steeper area . . . on the main run."

[3] In the area where the tree line is interrupted, there are two individual trees just off the edge of the trail, one 25 inches in circumference and the other 22 inches.

Prior to Thomas's accident, Massanutten had ordered and received a shipment of bright orange "warning barrier fencing" for use on Diamond Jim. At the time of the accident, Massanutten had installed fence posts in the area where Thomas was injured, but had not yet attached the bright orange fencing; the fencing was installed "a couple days later."[4]

As a result of his brain injury, Thomas is incompetent and was unable to testify. A friend, George Archer Marston (Marston), a civil engineer who accompanied Thomas to the Massanutten ski resort on the occasion in question, testified as a witness for the Guardian. According to Marston's testimony, he and Thomas, both experienced skiers, purchased lift tickets and began skiing about 9:00 a.m. on January 19, 1992. After warming up on some of the easier slopes, they took a chair lift to Diamond Jim. At the time, Diamond Jim had been groomed to its left edge, permitting skiers to ski all the way to that edge. In addition, snowmaking machinery was blowing snow across the ski run, blinding skiers using the right side of the run.

---

[4] The jury was instructed that evidence of Massanutten's post-accident erection of a fence on the poles installed pre-accident "is not received as evidence that [Massanutten] was negligent."

Also, there were "moguls" in the center of the ski run, but none on the edges.[5]

Thomas and Marston skied down the left side of Diamond Jim without incident.  They then took the chair lift for a second trip down Diamond Jim.  After skiing about halfway down the run, they stopped at a sign marked "slow," below which the slope steepened, and talked for a couple of minutes.  Thomas decided to ski down the left side of the run and, not "going fast," skied to the left laterally across the slope, with Marston following.

Marston stated that shortly before Thomas reached the edge of the slope, he "caught an edge and lost his balance,[6] bent at the knees and kind of sat down on the back of his skis and then slid off the edge of the slope out of . . . sight."  Marston skied "right up to the edge expecting to find [Thomas] adjacent to the slope, maybe six to eight feet below the edge of the slope," but instead "found this very steep, large vertical drop."  Thomas was lying between two logs at the bottom of the drop, "probably laterally a hundred feet away from [Marston and] over 30

---

[5] A witness described a "mogul" as "a mound that is usually created by skiers skiing down a steep area and cutting small hills into the side of the hill."
[6] "Catching an edge" refers to the situation that may result when, in making a turn, a skier tilts his skis and the

feet vertically below [him]." Thomas was unconscious and bleeding from his nose, mouth, and one ear.

Marston also testified that on his first trip down Diamond Jim on the morning of January 19, he did not see the steep drop-off. Marston stated further that, when he went to see what had happened when Thomas slid out of sight, he had to ski "right up to the edge[,] . . . probably three to five feet from the edge," before he realized the extent of the drop-off.

Dr. James Broderson (Dr. Broderson), a dentist who had skied at the Massanutten resort many times, was called as a witness by Massanutten. He skied down Diamond Jim on the morning of January 19, 1992, just ahead of Thomas. Dr. Broderson stopped approximately twenty feet downhill from the "slow" sign to make sure the course was clear before he "head[ed] on down." He observed Thomas skiing toward the left side of the slope, then trying "to initiate a turn to the right" but either catching an edge or crossing his skis, and falling forward "[o]ut of control."

After Thomas was carried away, Dr. Broderson went to the bottom of the drop-off where Thomas had been lying to look "for some evidence of how it was that [Thomas] got

---

uphill edge catches the snow and causes him to lose his balance.

hurt." There, Dr. Broderson found what appeared to be "an impact zone with a log." There was "[e]ither skin" or "maybe a little fiber something . . . that looked like he had . . . hit . . . there."

Dr. Broderson had seen "numerous tumbles like [Thomas's where] no one had been hurt, so [he] didn't think [Thomas] would be hurt from what [he] saw." Dr. Broderson explained, however, that he had "never been over to that edge and looked over." He thought that the ski "slope possibly continued out" and was approximately "level," that "you could probably ski around [the left side] like you did on the right side," where there was "a little easier way to go down the slope." He "didn't realize there was an embankment"; he "knew there was a little drop-off, but . . . had no idea it was like what it was there."

Dr. Gregory O'Shanick, a specialist in brain injuries, began treating Thomas in June of 1994. Dr. O'Shanick testified that the object which produced the injuries suffered by Thomas "would have to be something that was hard, something that was firm, that was not yielding."

At trial, the Guardian based her case for liability solely on the proposition that Massanutten was negligent in failing to warn skiers of the existence of the drop-off. In setting aside the jury verdict, the trial court, while

8

approving the jury's finding in favor of Thomas on assumption of risk and contributory negligence, ruled: (1) that without expert testimony "as to what was the standard of care in the industry," a lay jury could not "decide what would be an unreasonable risk"; (2) that there was no evidence to demonstrate that, had a warning been provided, it "would . . . have made any difference"; and (3) that there was no showing "that it was more probable . . . that the injury occurred after [Thomas] went over the bank than before."

### Expert Testimony

At trial, the Guardian presented the testimony of Richard Penniman (Penniman), an expert in skiing safety. The Guardian asked Penniman whether he was familiar with "the skier's code of responsibility." Upon receiving an affirmative answer, the Guardian asked Penniman whether there was "a written ski operator's responsibility." Massanutten objected to the question, and the trial court responded that "[t]he standard of care in the industry may be a relevant matter for the jury to consider," and allowed the Guardian to proceed. Penniman replied that there was no operator's responsibility code.

The Guardian then asked Penniman if he had "an opinion whether a warning was necessary in the area where Tommy

Hoar went off" the ski slope.  Massanutten objected to the form of the question, and the trial court sustained the objection.  The Guardian did not rephrase the question or pursue the matter further but made a proffer of the testimony Penniman would have given.  Nor did the Guardian object when Massanutten later produced expert testimony concerning whether the Diamond Jim trail was marked appropriately.

The Guardian now maintains that she "was not required to produce expert testimony as to the standard of care of ski area operators in the ski industry."  She says that "[w]hether a ski area ought to alert skiers to potential hazards or obstacles on a ski slope" is a matter "as to which [jurors] are as competent to form an opinion as the witness."

Massanutten contends, on the other hand, that under Burch v. Grace Street Building Corp., 168 Va. 329, 340, 191 S.E. 672, 677 (1937), the Guardian is estopped from taking a position inconsistent with one she assumed previously. Massanutten says that having "attempted to create a factual issue of the standard of care . . . by trying to elicit . . . testimony from [her] expert Penniman" concerning the existence of the duty to warn, the Guardian "is not

10

permitted now to take the inconsistent position that the same duty exists as a matter of law."

The Guardian's present position that expert testimony was not required to establish the duty to warn is not inconsistent with, but alternative to, her unsuccessful attempt to establish the duty through expert testimony. It is not unusual in the trial of a case for a litigant to find himself blocked in an effort to establish a point in a certain manner and then have to resort to a different approach to make the point.

It is the rule in Virginia that a litigant "may plead alternative facts and theories of recovery" and "state as many separate claims or defenses as he has regardless of consistency." Rule 1:4(k). See also Code § 8.01-281(A); Cooper v. Horn, 248 Va. 417, 423, 448 S.E.2d 403, 406 (1994). We perceive no reason why the considerations supporting this rule should not also support a litigant's shift to an alternative position in a situation like the present case.[7]

---

[7] Massanutten cites Smith v. Settle, 254 Va. 348, 492 S.E.2d 427 (1997). There, the plaintiffs elicited expert testimony to create factual issues of the existence of the defendant's duties and then took the position that the same issues were matters of law, suitable for jury instructions. Here, the Guardian was unsuccessful in her attempt to elicit expert testimony and only then took the position

Citing Rule 5:25, Massanutten also contends that by failing to object to Massanutten's use of expert testimony to describe the standard of care and by trying to elicit such testimony herself, the Guardian has failed to preserve an objection to Massanutten's use of expert testimony at trial. However, the Guardian is not complaining of Massanutten's use of expert testimony but of the trial court's ruling that she was required to produce expert testimony to establish a standard of care. Her assignment of error on the point states that the trial court erred in setting the verdict aside "on the grounds that expert testimony was required to prove whether the drop-off . . . posed an unreasonable risk of injury as to which [Massanutten] had a duty to warn."

Next, Massanutten argues that "the introduction of expert testimony concerning the standard of care with respect to ski slope operators' duty to warn was appropriate and, indeed, required in this case." We disagree.

In Board of Supervisors v. Lake Services, Inc., 247 Va. 293, 440 S.E.2d 600 (1994), we said:

> Expert testimony is inadmissible regarding "matters of common knowledge" or subjects "such that

that such testimony was not required. Hence, Smith v. Settle is inapposite.

12

[persons] of ordinary intelligence are capable of comprehending them, forming an intelligent opinion about them, and drawing their own conclusions therefrom." Thus, when the question presented can be resolved by determining what precautions a reasonably prudent person would have taken under like circumstances, no expert testimony is required or permitted.

Further, expert testimony is admissible only when specialized skill and knowledge are required to evaluate the merits of a claim. Issues of this type generally arise in cases involving the practice of professions requiring advanced, specialized education, such as engineering, medicine, and law, or those involving trades that focus upon scientific matters, such as electricity and blasting, which a jury cannot understand without expert assistance.

Id. at 297, 440 S.E.2d at 602 (citations omitted).

Here, the issue, as framed by one of the instructions granted below, was whether Massanutten, in the exercise of ordinary care, was obligated to warn skiers of an unsafe condition that was not open and obvious. This was not a complicated or technical issue, and its resolution did not require specialized skill or knowledge. Rather, it concerned matters of common knowledge that jurors, with the application of a reasonable amount of common sense, are as competent of understanding and deciding as the expert witness. Indeed, as Kenneth Hess (Hess), Massanutten's assistant ski area manager, put it in his testimony: "Common sense tells you that you ought to tell people that

13

there's a problem on a ski slope that's not easily identifiable."

Finally, by way of cross-error, Massanutten contends that the trial court erred in refusing to exclude testimony of the Guardian's expert witness, Penniman, to the effect that Massanutten had created "a gap in the cut and fill line" and "a recess of the trees [so that the] trees now are way, way back away from where the edge of the fill is [and] the skier no longer has the visual cue that this is the edge of the trail."

Massanutten argues that Penniman's testimony that "the skier no longer has the visual cue" was inadmissible because it was based upon an assumption not supported by the record, i.e., that "the edge [of the ski trail] was not visible." Massanutten also says that this assumption was contradicted by the Guardian's own witness, Marston, who testified that he "could tell where [he] thought the edge of the slope was . . . from where [he was] standing at the slow sign."

However, Penniman's testimony concerning "the visual cue" was not based upon an unsupported assumption but upon his personal observations, made on two visits to the ski slope, and from his having "skied at Massanutten . . . during [his] investigation of [Thomas's] accident." And,

14

although Marston, the Guardian's witness, said he could tell where he thought the edge was from where he had stopped near the "slow" sign, he stated that he did not realize "the extent of that drop-off . . . until [he] skied right up to the edge" and found "this very steep, large vertical drop."

But even if Penniman's testimony varied from Marston's, it does not follow that Massanutten was entitled to have Penniman's version excluded.  Thomas is the real party plaintiff in this case, and he did not testify.  Hence, this situation is not subject to the rule of Massie v. Firmstone, 134 Va. 450, 114 S.E. 652 (1922), that a litigant's "statements of fact and the necessary inferences therefrom are binding upon him."  Id. at 462, 114 S.E. at 656.  Rather, Thomas is entitled to the benefit of the corollary enunciated in Massie v. Firmstone that "when two or more witnesses introduced by a party litigant vary in their statements of fact, such party has the right to ask the court or jury to accept as true the statements most favorable to him."  Id.

### Primary Negligence

Massanutten cites Whitfield v. Cox, 189 Va. 219, 52 S.E.2d 72 (1949), where we said that "[t]he owner or proprietor of a place of [business has the] duty

15

. . . to exercise reasonable care for [his invitee's] safety and protection — such care as would be exercised by an ordinarily careful and prudent person in the same position and circumstances."  Id. at 223, 52 S.E.2d at 73-74.  Massanutten then states that "[i]n order to prove negligence, [the Guardian] had to demonstrate that Massanutten clearly departed from the accepted standard of care followed by ordinary, prudent ski slope operators of similar slopes."

Massanutten cites testimony by Marston that he had "seen trails out West that 'have probably steeper vertical drops than this off the edge, but they are always either clearly marked or they are clearly visible.'"  Massanutten then asserts that, here, "the uncontradicted evidence of [the Guardian's] and Massanutten's witnesses [was] that the day was clear, the edge was visible from 100 feet, it created a horizon[8], and there was a known drop-off of some unknown dimension."  Thus, says Massanutten, "because

---

[8] The significance of Massanutten's reference to a "horizon" is that Marston testified a skier would see a horizon while "going from the right side [of the ski slope] over to the left side" and that the horizon is "a key giveaway," telling the skier he "can't continue to see the terrain because of the steepness of the slope."

16

the condition was 'clearly visible,' there was no need for . . . [a] warning."

Continuing, Massanutten submits that it is irrelevant that "someone else may have marked the trail differently." The issue, Massanutten states, "is whether evidence exists to prove that Massanutten clearly departed from the accepted standard of care followed by ordinary, prudent ski slope operators of difficult courses when it did not mark the plainly visible edge of a trail beyond which skiers knew they should expect conditions they 'may need to avoid.'" Such evidence, Massanutten concludes, "does not exist," and, "[b]ecause there is no conflict of evidence on this question, the judgment for Massanutten must be affirmed."

However, there was a conflict in the evidence on the question whether the "condition" existing "off the edge" was plainly visible. As Massanutten stresses, Marston, the Guardian's witness, said he could tell where he thought the edge was from where he had stopped near the "slow" sign. And Massanutten's expert witness, Larry D. Heywood (Heywood), testified it was his opinion "that the edge of the run . . . where [Thomas] went off was visible from around 100

17

feet."  But Dr. Broderson, Massanutten's witness, who also had stopped near the "slow" sign, stated that he thought the ski slope possibly "continued out" and was approximately "level," providing an "easier way to go down the slope."  And Penniman, the Guardian's expert witness, stated that "the skier no longer has the visual cue that this is the edge of the trail."  This conflict in the evidence presented a typical issue for jury determination.

On a similar point, citing an instruction granted below, Massanutten points out that an occupant of premises has a duty to warn of an unsafe condition unless the "condition is open and obvious to a person using ordinary care for his own safety."  Massanutten repeats what Marston said about seeing the edge from where he stopped at the "slow" sign and about a horizon being "a key giveaway" that there is "steep terrain" beyond it.  Massanutten then opines that, with this information available, "it is readily apparent that 'a person using ordinary care for his own safety' would have avoided skiing near the edge."

Here again, however, Massanutten is unwilling to recognize there was a conflict in the testimony relating to whether the condition existing off the

18

edge of the ski trail was plainly visible, a conflict that necessarily encompasses the question whether the condition was open and obvious. That question, therefore, was also a matter for jury determination.

Furthermore, there was a direct conflict in the evidence resulting from the "battle of the experts" over the crucial issue whether Massanutten should have given warning of the existence of the drop-off, and this conflict alone was sufficient to make a jury issue of Massanutten's negligence. The Guardian's expert witness, Penniman, testified that the "hidden drop-off" constituted a "dangerous area" and that, according to "the practice and custom in the ski industry," a warning in the form of "a simple bamboo and rope fence," costing about $10, was needed to "inform the skier . . . you don't want to go here."

On the other hand, Massanutten's expert witness, Heywood, testified that "the Diamond Jim run was maintained and marked appropriately [in conformity] with the custom and practice" of the ski industry and, accordingly, that it was not necessary "to put any type of marking on [the drop-off]." Heywood further opined that, according to custom and practice, marking of the drop-off was unnecessary because "skiers are

19

aware that there are edges to the run" and that "[o]ff the edge . . . is a variety of things, trees, stumps, rocks, whatever."[9]

Finally, there was a dispute concerning the purpose of the bright orange "warning barrier fencing" Massanutten had ordered and received but, at the time of Thomas's accident, had not yet attached to the already-in-place fence posts in the area of the drop-off. Hess, Massanutten's assistant ski area manager, testified that the purpose of the fencing was "[t]o retain snow on the slope." However, before Diamond Jim was opened to the public, a letter written by the engineer employed in the construction of Diamond Jim to the slope designer on the project stated that "[f]encing of the high visibility, portable type will need to be installed at various locations to direct

_____

[9] Citing Atlantic Rural Exposition, Inc. v. Fagan, 195 Va. 13, 77 S.E.2d 368 (1953), Massanutten questions the propriety of the Guardian's use of Penniman's testimony to prove the existence of a duty to warn. Massanutten says that the testimony "only compared Massanutten with other facilities and custom and practice" and that "comparison with what others may do is not the question." See id. at 25, 77 S.E.2d at 374. However, it should not escape notice that Massanutten presented precisely the same character of testimony on the same subject through its expert witness, Heywood. Hence, Massanutten will not be heard to complain. See Hoier v. Noel, 199 Va. 151, 155, 98 S.E.2d 673, 676 (1957).

the flow of traffic and <u>to indicate possible hazards</u>."

(Emphasis added.)

Massanutten devotes a vague footnote to this subject in which it says that the Guardian "juxtapositions" Massanutten's ordering of the fencing with the letter from the construction engineer "to infer that Massanutten had planned, but not yet erected, warning fencing at the area of the drop-off." Not suprisingly, the Guardian does exactly what Massanutten accuses her of. She argues, and we think justifiably so, that "[t]he jury was entitled to infer from this evidence that Massanutten obtained and used this bright orange fencing to warn skiers to maintain a safe distance away from dangerous areas, that it intended to do so at the drop-off on Diamond Jim, and that it was negligent for failing to do so in this instance."

Causation

As noted previously, with respect to the issue of causation, the trial court made two rulings. First, the court ruled that there was no evidence to demonstrate that, had a warning been provided, it "would . . . have made any difference." Second, the court ruled that there was no

21

showing "that it was more probable . . . that the injury occurred after [Thomas] went over the bank than before."

Concerning the trial court's first ruling, Penniman, the Guardian's expert witness, was asked "[w]hat good" a warning would have been to a skier in Thomas's situation. Penniman responded that "a fence or a rope barricade tells [skiers] that the ski area doesn't want them over there . . . that it's hazardous . . . [s]o they behave differently"; "[t]hey aren't as inclined to get close to that edge"; they "usually approach it much more cautiously"; and if they lose balance, "instead of trying to regain their balance . . . they will just fall and let themselves come to a stop rather than fight it."

Thomas, of course, was unable, because of his disability, to tell the jury whether, had a warning been provided, he would have heeded it in the manner suggested by Penniman.  Nor could anyone have spoken for Thomas.  But "[f]requently material facts are not proven by direct evidence.  A verdict may be properly based upon reasonable inferences drawn from the facts.  If facts are present from which proper inferences may be drawn this is sufficient." Northern Virginia Power Co. v. Bailey, 194 Va. 464, 470, 73 S.E.2d 425, 429 (1952).  Here, from the circumstances that were proven below, and "[a]ccording to the ordinary

22

experience of mankind," the jury was "warranted in the conclusion that [Thomas's] injury would not have occurred had [a warning] been given." Southern Ry. Co. v. Whetzel, 159 Va. 796, 807, 167 S.E. 427, 430 (1933). See also Norfolk S. Ry. Co. v. Lassiter, 193 Va. 360, 370, 68 S.E.2d 641, 647 (1952).

Concerning the trial court's ruling with respect to the issue whether Thomas's injury occurred before or after he "went over the bank," the issue could be disposed of easily by reference to an admission made by Massanutten in a memorandum supporting its motion to set aside the verdict: "Although we know that the injury must have occurred after Mr. Hoar fell and went over the edge, there is no evidence to show in more detail how or why he hit his head so as to cause the brain injury." (Emphasis added.)

Aside from the admission, Dr. Broderson's testimony showed clearly that Thomas's injury occurred after he "went over the bank." Dr. Broderson was asked: "[W]hen [Thomas] fell forward, where was he in relation to the edge of the trail?" Dr. Broderson replied that Thomas "was actually over — slightly over the embankment from the time he fell."

Furthermore, there is Dr. Broderson's testimony that he found what appeared to be "an impact zone with a log" and a substance that was "[e]ither skin" or "maybe a little

23

fiber something . . . that looked like [Thomas] had . . . hit . . . there."  This testimony was sufficient to supply the final link in the chain of causation from Massanutten's negligence to Thomas's injury, permitting the jury to find from all the evidence that Thomas sustained his injury by striking the log after falling to the bottom of the drop-off and not, as Massanutten hypothesizes, by striking "the hard packed snow which he would have struck when he tumbled head first at the edge."

### Assumption of Risk and Contributory Negligence

By way of cross-error, Massanutten contends that the trial court erred in failing to find as a matter of law that Thomas assumed the risk of injury and was guilty of contributory negligence.  With respect to assumption of risk, Massanutten engages in a discussion of the theory of inherent risks, a theory, as Massanutten acknowledges, "Virginia case law has not had an opportunity to develop" in skiing cases.  The courts of other jurisdictions, Massanutten says, have applied the theory and barred recovery for ski injuries where "the accident resulted from [risks] inherent [in skiing] and not from negligent operation of the course."[10]

---

[10] The out-of-state cases cited by Massanutten are Swenson v. Sunday River Skiway Corp., 79 F.3d 204 (1st Cir. 1996)

24

However, the jury in this case was instructed according to familiar principles that if Thomas "fully understood the nature and extent of a known danger, and if he voluntarily exposed himself to it, he assumed the risk of injuring himself from that danger" and could not recover for his injuries.  The jury was also instructed that Massanutten had the duty of proving the defense of assumption of risk by the greater weight of the evidence.

Massanutten makes no complaint about these instructions.  They constitute the law of the case, and they do not incorporate the theory of inherent risks.  Accordingly, we will make our decision guided by the principles enunciated in the instructions independent of that theory.

We agree with the trial court that whether Thomas assumed the risk of injury was a matter for the jury to determine.  Here, again, Massanutten asserts that there was no conflict concerning the subject.  Yet, there was dispute about practically every facet of the evidence relating to

---

(applying Maine statute, moguls held inherent risk of skiing); Connelly v. Mammoth Mt. Ski Area, 45 Cal.Rptr.2d 855 (Cal.Ct.App. 1995) (colliding with ski lift tower inherent risk of sport); O'Donoghue v. Bear Mt. Ski Resort, 35 Cal.Rptr.2d 467 (Cal.Ct.App. 1994) (knowingly encountering off-trail obstacles inherent risk of skiing); Atwell v. New York, 645 N.Y.S.2d 658 (N.Y.App.Div. 1996)

whether Thomas fully understood the nature and extent of the danger and voluntarily exposed himself to it.  The standard to be applied in an assumption of the risk case "'is a subjective one, of what the particular plaintiff in fact sees, knows, understands and appreciates.'"  Amusement Slides Corp. v. Lehmann, 217 Va. 815, 818-19, 232 S.E.2d 803, 805 (1977) (quoting Restatement (Second) of Torts § 496D, Comment c (1965)).  These were matters peculiarly within the province of the jury and properly left to it for decision.

We take the same view of the question of contributory negligence.  The standard here is an objective one, whether Thomas acted for his own safety as a reasonable person would have acted under similar circumstances.  See Artrip v. E.E. Berry Equip. Co., 240 Va. 354, 358, 397 S.E.2d 821, 824 (1990).  The jury was so instructed.  The jury was also instructed that Thomas had the right to assume the premises were reasonably safe for his visit unless he knew or should have known of an unsafe condition or used the premises in a manner exceeding the scope of the invitation.  Considering the conflicting evidence in this case in light of these principles, we think reasonable minds could differ on the

---

(applying statute making berm at edge of trail inherent danger of skiing).

26

question whether Thomas acted for his own safety as a reasonable person would have acted.  Hence, the trial court did not err in submitting the question to the jury.

For the reasons assigned, we will reverse the judgment of the trial court, reinstate the jury verdict, and enter final judgment thereon in favor of the Guardian.

<u>Reversed and final judgment</u>.